**Desiree MARTINEZ, Appellant,**

v.

**CITY OF SAN ANTONIO, Appellee.**

No. 04–05–00775–CV.

Court of Appeals of Texas, San Antonio.

Dec. 6, 2006.

Randy Gathany, San Antonio, for appellant.

David M. Williams, Office of the City Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Desiree Martinez appeals from the trial court's order granting the City of San Antonio's plea to the jurisdiction, motion for no-evidence summary judgment, and traditional motion for summary judgment. We affirm.

### BACKGROUND

This lawsuit arises from the attempted sexual assault of Desiree Martinez. On July 3, 1997, Richard Diaz, a thirty-nine-year-old man, called Martinez, a fourteen-year-old girl, and asked if she would like to go "have a cold one", an offer that she accepted. When Diaz arrived at her house, Martinez gathered her belongings and told her parents that she was going to a "staff meeting." Diaz and Martinez then went to Diaz's home, stopping only to purchase alcohol. After several hours of drinking, Diaz attempted to sexually assault Martinez. Martinez, however, fought back and fled the house. Martinez reported the attack to the Kirby Police Department, and Diaz was later convicted of attempted sexual assault.

In November 2001, Martinez filed a civil lawsuit against Diaz, Diaz's business (Richard Diaz and Diana Huron Alonso d/b/a Diaz and Associates), and the University of Texas System. In January 2002, Martinez filed an amended petition, adding the City of San Antonio as a defendant. According to the amended petition, the City of San Antonio Police Department was awarded a federal grant to create a program, administered by the City of San Antonio Office of Community Initiatives, to curb gang violence. Martinez alleges that the Office of Community Initiatives, in turn, received assistance from the Hispanic Research Center at the University of Texas at San Antonio. According to Martinez, as part of this initiative to curb gang violence, she was hired during the summer by the City of San Antonio and was supervised by Diaz, a convicted sex offender. Thus, she claims that the City was negligent in hiring Diaz and in allowing a convicted sex offender to come into contact with and supervise her, a fourteen-year-old-girl.

In response, the City filed a plea to the jurisdiction, or alternatively, a traditional and no-evidence motion for summary judgment. Attached to the City's plea and motion was an affidavit by Daniel G. Akeroyd, a lieutenant with the police department and program director of the Gang Rehabilitation Assessment and Services Program ("GRAASP") in the Youth Crime Services Unit. In his affidavit, Akeroyd described the program:

> GRAASP was a comprehensive, community-wide effort designed to prevent and suppress gang activity and crime through various forms of intervention. Key intervention activities included services for the participant gang members and their families, including counseling, medical and psychological assessments, crisis intervention and job readiness training, as well as community mobilization strategies. Prior to the formation of GRAASP, the San Antonio Police Department generally responded to gang activity and crime with various forms of suppression, e.g. detention and arrest. With GRAASP, the police department had access to an array of intervention strategies, and thereby, different methods of police protection and services for the purpose of the health, safety, and welfare, not only for the urban community but also for the public at large. There were five cities participating in the grant program.

Akeroyd explained that the program was funded by the U.S. Department of Justice,

Office of Juvenile Justice and Delinquency Prevention.

Akeroyd also affirmed that neither Martinez nor Diaz (including his business Diaz & Associates) had ever been employed by the City or Community Initiatives.[1] Further, the City "was not involved in the screening of UTSA's staff for employment." According to Akeroyd, UTSA's role "was to evaluate data pertaining to the GRAASP program and report on the impact of the program on the community, crime rates, and the youth." It was independent from both the City and the police department "in order to ensure objective reporting of the results of the GRAASP program."

Attached to Akeroyd's affidavit was a true and correct copy of the grant application. According to the application, the objectives of GRAASP were to recruit "gang member participants, with selection based upon probation or parole status, degree of involvement in gang activity and crime, residence in the target neighborhood,[2] and the severity of the gang member's criminal record." Then, each gang member participant would be assessed through "an assessment interview, and when appropriate, an educational, vocational, medical or psychological assessment." After being assessed, GRAASP would develop goals and a case strategy for each participant. The objective was to have at least 85% of all participants enroll or participate in "meaningful activities." Thus, the objective was for at least 85% of participants to be employed or seeking

employment, enrolled in school, GED classes, vocational courses or other forms of education. Each participant would be monitored for "present criminal activity and arrests in order to determine an increase or decrease in participant crime as well as crime in the target neighborhood." Another objective of the program was to prevent gang violence by participating in "neighborhood association meetings, COP meetings, National Night Out, and neighborhood clean-up efforts." The police department was listed as the "lead agency" and maintained the grant funds for the project.

In its motion, the City argued that Martinez's claims were barred because Martinez had not complied with the Texas Tort Claims Act. In response, Martinez claimed that because GRAASP is a proprietary function of the City, the Act does not apply. The trial court agreed with the City and dismissed Martinez's claims. It then severed the claims against the City from the underlying cause. Martinez appeals.[3]

GOVERNMENTAL OR PROPRIETARY FUNCTION?

 Sovereign immunity protects the State from lawsuits for money damages. *Reata Constr. Corp. v. City of Dallas,* 197 S.W.3d 371, 374 (Tex.2006). Unless expressly waived, its political subdivisions, including cities, are also entitled to such immunity, referred to as governmental immunity. *Id.* Sovereign or governmental immunity encompasses immunity from suit, which bars a suit unless the state has

---

1. In response to Martinez's allegation in her petition, Akeroyd also affirmed that Community Initiatives did not administer GRAASP, and even if it had, Community Initiatives never employed Martinez.

2. Certain neighborhoods in San Antonio with high levels of gang activity were specifically targeted by the program.

3. After the trial court granted the City's summary judgment and severed the cause, Martinez took a post-answer default judgment against Diaz and nonsuited the remaining defendants.

consented, and immunity from liability, which protects the state from judgments even if it has consented to the suit. *Id.* Immunity from suit deprives a trial court of subject-matter jurisdiction. *Id.*

■ Initially, sovereign immunity was a common-law doctrine that developed without any legislative or constitutional enactment. *Id.* Recognizing that sovereign immunity is a common-law doctrine, the Texas Supreme Court has "not foreclosed the possibility that the judiciary may modify or abrogate such immunity by modifying the common law." *Id.* at 375. As such, the judiciary remains responsible for defining "the boundaries of the common-law doctrine and ... determin[ing] under what circumstances sovereign immunity exists in the first instance." *Id.* However, despite this responsibility, the supreme court has "generally deferred to the Legislature to waive immunity because the Legislature is better suited to address the conflicting policy issues involved." *Id.*

■ One such legislative waiver of immunity is the Texas Tort Claims Act. *See* Tex. Civ. Prac. & Rem.Code Ann. 101.001–.109 (Vernon 2005 & Supp.2006). When a municipality commits a tort while engaged in a governmental function, its liability is determined by the provisions of the Texas Tort Claims Act. *See id.* 101.0215(a) (Vernon 2005); *Tex. River Barges v. City of San Antonio,* 21 S.W.3d 347, 356 (Tex. App.-San Antonio 2000, pet. denied). Here, the City, in its plea to the jurisdiction and motion for summary judgment, argued that Martinez's claims were barred because Martinez did not comply with the Texas Tort Claims Act.[4] In response and now on appeal, Martinez argues that the Texas Tort Claims Act does not apply because the City was performing a proprietary function, not a governmental one. Thus, we must consider whether GRAASP was a governmental or proprietary function of the City.

■ When a municipality commits a tort while engaged in a proprietary function, it is liable to the same extent as a private entity or individual. *See Dilley v. City of Houston,* 148 Tex. 191, 222 S.W.2d 992, 993 (1949); *see also Tooke v. City of Mexia,* 197 S.W.3d 325, 343 (Tex.2006) ("A municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions."). Under common law, "generally speaking, a municipality's proprietary functions are those conducted in its private capacity, for the benefit of those within its corporate limits, and not as an arm of the government." *Tooke,* 197 S.W.3d at 343 (quotation omitted). In contrast, "governmental functions are in the performance of purely governmental matters solely for the public benefit." *Id.* (quotation omitted).

■ However, a court need not consider classification of an activity under common law if the activity is defined by statute. As the Texas Supreme Court has recently explained, the "Texas Constitution authorizes the Legislature to 'define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common

---

4. Pursuant to the Texas Tort Claims Act, a plaintiff must give a governmental unit notice of a claim no later than six months after the day the event giving rise to the claim occurs unless the governmental unit had actual notice of the event. *See* Tex. Civ. Prac. & Rem.

Code Ann. § 101.101 (Vernon 2005). On appeal, Martinez acknowledges that if the Texas Tort Claims Act applies, "she did not meet the requirements of the Act, and the relief she seeks on appeal should be denied."

law.' " [5] *Id.* (quoting Tex. Const. art. XI, § 13).

In enacting the Texas Tort Claims Act, the Legislature defined proprietary functions as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality." [6] Tex. Civ. Prac. & Rem.Code Ann. § 101.0215(b) (Vernon 2005). For purposes of tort liability, the Legislature defined governmental functions as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Id.* § 101.0215(a). It included the following among a municipality's governmental functions: "police . . . protection and control"; and "community, neighborhood, or senior citizen centers." *Id.* § 101.0215(a)(1), (17). The City argues that GRAASP is included within these definitions of governmental functions.[7] Martinez, on the other hand, points to the common-law definition and argues that GRAASP was created for the benefit of those within its corporate limits, and not as an arm of the government.

In considering whether GRAASP is a governmental or proprietary function, we note that a plaintiff may not "split various aspects of [a municipality's] operation into discrete functions and recharacterize certain of those functions as proprietary." *City of San Antonio v. Butler,* 131 S.W.3d 170, 178 (Tex.App.-San Antonio 2004, pet. denied). As such, Martinez cannot point to part of GRAASP's activities and argue that GRAASP was a proprietary function of the City. Instead, we must consider GRAASP as a whole.

Although not a pure "arrest and incarcerate" method of law enforcement, GRAASP was nevertheless a function of law enforcement and a valid governmental use of police power. *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.0215(a)(1) (Vernon 2005) (listing police protection and control as a governmental function). The objective of the program was to intervene in the lives of gang members, thereby reducing gang violence and crime in the City. It was a crime prevention and reduction program, implemented and administered by the police department, funded by the Department of Justice, and it benefited the general public. That it also provided counseling services and job training does

---

**5.** Thus, in *Tooke v. City of Mexia,* 197 S.W.3d 325, 343–44 (Tex.2006), the supreme court held that because the Legislature has statutorily defined "garbage and solid waste removal, collection, and disposal" as a governmental function in the Texas Tort Claims Act and because that definition described the services one of the parties had agreed to provide, the court saw "no reason to think that the classification would be different under the common law."

**6.** The Legislature listed the following examples as proprietary functions: "the operation and maintenance of a public utility"; "amusements owned and operated by the municipality"; "any activity that is abnormally dangerous or ultrahazardous." Tex. Civ. Prac. & Rem.Code Ann. § 101.0215(b) (Vernon 2005).

**7.** In its brief, the City also argues that pursuant to section 101.0215(a)(34) of the Texas Tort Claims Act, GRAASP should be considered a "community development or urban renewal activities undertaken by municipalities and authorized under Chapters 373 and 374, Local Government Code." However, the City does not point to anything in the record reflecting that GRAASP was a program authorized under Chapters 373 and 374 of the Local Government Code. *See* Tex. Loc. Gov't Code Ann. § 373.005(a) (Vernon 2005) ("To conduct work or activities . . ., a municipality may adopt a community development program by ordinance or resolution."); *id.* § 374.011 (providing that before municipality may exercise power under chapter 374's Urban Renewal, it must adopt a resolution and hold an election).

not transform it into a proprietary function. *See Butler*, 131 S.W.3d at 178 (explaining that the various aspects of a municipality's operation cannot be split into discrete functions and then recharacterized as proprietary). We hold that GRAASP is a governmental function under section 101.0215(a)(1) of the Texas Tort Claims Act, a function of the City's police protection and control. And, because we have held that GRAASP falls within the Texas Tort Claims Act's definition of governmental function, we need not consider Martinez's argument that GRAASP would not be a governmental function under common law. *See Tooke*, 197 S.W.3d at 343–44 (determining that the services provided by the appellant were included within section 101.0215(a)'s list of governmental functions and seeing "no reason to think that the classification would be different under the common law").

## Conclusion

Because GRAASP is a governmental function under the Texas Tort Claims Act, in order to bring suit, Martinez was required to follow the provisions of the Act. Martinez, however, admits that she did not comply with the Act's notice provision. As such, the trial court did not err in dismissing Martinez's claims against the City.[8]

---

8. Having determined that Martinez did not comply with the Act's notice provision, we need not consider the other issues presented.