**DISSENT and Opinion Filed June 29, 2021**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

No. 05-19-01431-CV
_____

**TOWN OF HIGHLAND PARK, Appellant**
**V.**
**TIFFANY RENEE MCCULLERS, ET AL., Appellees**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-08709**

**DISSENTING OPINION**

Before Chief Justice Burns and Justices Pedersen, III and Goldstein
Dissenting Opinion by Chief Justice Burns

My colleagues rely on labels instead of function—here, the Town of Highland Park's coordination of private security services for a resident—to deny deceased Officer McCullers' family their day in court and conclude Town's actions qualified as police protection and served a governmental function. I disagree and accordingly dissent.

When municipalities perform governmental functions they are cloaked with the State's sovereign immunity. *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 430 (Tex. 2016) (*Wasson I*) ("[A] municipality's immunity extends

only as far as the state's but no further."). Governmental functions are "those acts which are public in nature and performed by the municipality as the agent of the State in furtherance of general law for the interest of the public at large." *Gates v. City of Dallas*, 704 S.W.2d 737, 738–39 (Tex. 1986) (internal quotation omitted)). In contrast, discretionary activities primarily for the benefit of the citizens (here one citizen property owner) within the corporate limits of a town are proprietary functions outside of the immunity conferred by the State. *Id.*; *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (distinction lacks clarity, but generally, "proprietary functions are those conducted in. . . [municipality's] private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government, while its governmental functions are in the performance of purely governmental matters solely for the public benefit") (internal quotation omitted)). As discussed below, unless the function at issue is statutorily designated as governmental, the municipality's entitlement to immunity thus depends on "the relationship, or lack thereof, between the municipality and the state, not the relationship between the municipality and the party bringing suit." *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 146 (Tex. 2018) (*Wasson II*) (internal quotation omitted)).

The legislature designated thirty-six municipal functions that are governmental for purposes of immunity, including "police and fire protection and

2

control." TEX. CIV. PRAC. & REM. CODE §101.0215 (a)(1).  Conduct enumerated in the statute as governmental deprives us of discretion to treat that conduct as proprietary.  *City of Plano v. Homoky*, 294 S.W.3d 809, 814 (Tex. App.—Dallas 2009, no pet.).  Notably, we focus on the conduct at issue, rather than the label used by Town—police related or non-police related—or the existence of a written policy utilized by Town.

The majority appears to rely on Town's argument that "all actions related to" a category included in the statute's list of governmental functions deserve the same treatment as the enumerated function, thereby foregoing any analysis of whether coordination of private security services deserves immunity as police protection and control.  In support of this argument, Town cites *City of Dallas v. Reata Construction Corp.*, 83 S.W.3d 392, 395 (Tex. App.—Dallas 2002), *rev'd on other grounds,* 197 S.W.3d 371 (Tex. 2006), for its holding that "when the legislature changed a classification from proprietary to governmental, it intended *all* actions taken by a city within that category to be reclassified."  Reliance on this holding, however, begs the question at issue here: whether coordination of private security falls within the category of "police protection."  Certainly, all functions related to coordination of police protection to be provided by *on-duty officers*, for instance added neighborhood patrols, responses to suspicious persons, and traffic control in

3

connection with a funeral[1] or the Fourth of July parade that occurred earlier the same day through Town's streets would fall within the ambit of police protection. But coordination of *security services,* to be provided by off-duty officers, on private property, for one private citizen, warrants a closer examination.

In *Martinez v. City of San Antonio*, 220 S.W.3d 10, 15 (Tex. App.—San Antonio 2006, no pet.), our sister court examined the City of San Antonio's Gang Rehabilitation Assessment and Services Program (GRAASP), in its Youth Crime Services Unit. The program was funded by the U.S. Department of Justice and although run independently of the City and the police department, the City managed the funds for the program. The grant application described the program as intervention strategies and different methods of police protection and services, for the urban community and public at large. Under to the program, gang members were recruited based on their degree of involvement in gang activity and crime, and the severity of their criminal record. Each participant was interviewed and assessed for vocational, educational, medical or psychological status, with the goal of enrolling 85% of the participants in school or vocational training. The criminal activity and arrests of each participant were also monitored for increases or decreases, as was the crime in the target neighborhoods. In addition to reducing gang violence committed by the participants, the program sought to increase neighborhood participation in

---

[1] *See Blackwell v. Harris Cty.,* 909 S.W.2d 135, 139 (Tex. App.-Houston [14th Dist.] 1995, writ denied).

community events and associations as an additional avenue to reducing gang violence. *Id.* at 13. The San Antonio court concluded GRAASP was a law enforcement program, and therefore a governmental rather than proprietary function for which the City was entitled to immunity. It refused to "split various aspects" of the program to conclude that the counseling and job training altered the fundamental purpose of the program: a "crime prevention and reduction program, implemented and administered by the police department, funded by the Department of Justice . . . [for the] benefit . . . [of] the general public." *Id.* at 15.

In contrast, Town coordinated private security services for private property owners, here, one private property owner. While the effect of these services may ultimately have been crime reduction, their fundamental purpose was private loss prevention. *See, e.g.*, *Elizondo v. State*, 382 S.W.3d 389, 394 (Tex. Crim. App. 2012) (private citizen providing loss-prevention services not acting as law enforcement). Certainly, the effect of alarm monitoring or fencing would be the same, yet we would have no difficulty concluding that coordination of those services would fall far outside of police protection, particularly when those services were not provided for the general public or indeed even all of Town's citizens.

Moreover, unlike my concurring colleague, I find little persuasive relevance and certainly nothing binding in *Homoky*, 294 S.W.3d at 813–14. Neither the conclusion that operation of a golf course falls within the defined governmental

5

function of a "recreational facility"[2] nor the analysis utilized in reaching that conclusion suggests coordination of private security services provided by off-duty officers falls within the definition of "police protection." Further, unlike *Homoky* in which the plaintiff sought to split consideration of the golf course operation, which easily fell within a defined governmental function, from operation of the club house in which the plaintiff's injury occurred and which did not fall so easily within the same definition, no such splitting is required here. *Id*. at 813 (improper to split operation of golf course from operation of a clubhouse for purposes of evaluating proprietary versus governmental functions). We examine only coordination of security services; no coupled activity exists.[3]

Likewise, Town's reliance on *Hallmark v. City of Fredericksburg* for the broad application of "police protection" fails to persuade. *Hallmark v. City of Fredericksburg*, No. 04-99-00519-CV, 2000 WL 730601, at *3 (Tex. App.—San Antonio June 7, 2000, pet. denied) (mem. op., not designated for publication). In *Hallmark*, off-duty officers practicing softball at a law enforcement center threatened the owner of adjacent property with arrest if he refused to return the ball they had hit onto his property. Concluding such a threat fell within "police

---

[2] · TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(23).

[3] I disagree with my concurring colleague that an analysis of Town's coordination of private security services divorces that function from "police services overall." Relying on the fact that Town's police department had a policy and overall scheme for coordinating off-duty service eliminates the entire analysis. Overall scheme or no, the question we examine is the purpose of Town's activity.

protection" does not inform our analysis, however, since we see no parallel between that overt exercise of police authority and Town's coordination of private security services.

In his deposition, Town's Chief of Police testified Town coordinated and provided private security services because the residents wanted the service, "like if they're having a party or something," which also provided "additional officers in the city and additional security." He also testified Town provided those services as a courtesy and could decline to provide them. The officers were paid by the private citizens who requested their services, although at least one of the officers who coordinated such services did so while on duty for Town. Requests were made by citizens directly to the police department with the Chief or his assistant then checking if specific officers wanted the assignments, or were made directly to individual officers who accepted the work or searched for others if they did not. Nowhere in our record did the Chief describe the purpose or function of Town's coordination of these services as police protection or law enforcement.[4] Instead, while performing the services Town coordinated, Officer McCullers was in his private vehicle, and rather than patrolling, was sitting in one place, essentially functioning as a night-watchman for one citizen.

---

[4] And notably for the summary judgment posture presented, appellees' pleadings describe Town's activity as "coordinating private security guard services for the convenience of residents of the Town."

Evidence that Town communicated private security requests only to licensed peace officers who in turn are potentially on duty 24 hours a day, provides the apparent basis for the majority's naked conclusion that "Officer Morden coordinated with Officer McCullers in furtherance of police protection at the Property." The fact that a peace officer was assigned to this off-duty task, however, does not convert Town's actions (or the officer's) to governmental conduct. Indeed, if we were examining Officer McCullers' entitlement to immunity for some action taken while guarding the Property, we would look to whether he observed a crime so as to trigger his on-duty status. *See City of Balch Springs v. Austin*, 315 S.W.3d 219, 225 (Tex. App.—Dallas 2010, no pet.) ("If an off-duty officer observes and responds to a crime, he becomes an on-duty officer."); *see also CKJ Trucking, L.P. v. City of Honey Grove*, 581 S.W.3d 870 (Tex. App.—Dallas 2019, pet. denied). Thus, the potential for activation of on-duty status and the fact that a peace officer's off-duty status does not discharge his police authority has no bearing here, since those possibilities exist in any off-duty work in which an officer might engage. If we relied on the potential trigger to on-duty status, we would thus render the entire question at issue irrelevant when the questioned task was performed in connection with a municipality's peace officers. *See, e.g., City of Houston v. Shilling*, 240 S.W.2d 1010, 1012 (Tex. 1951) (rejecting maintenance of garbage trucks as necessary to provision of governmental garbage collection services, since "[s]urely

8

all operations which make it possible for the city to collect garbage are not part of that function in the sense that the city is immune to liability in its performance."); *see also CKJ Trucking, L.P.*, 581 S.W.3d at 877 (in evaluating immunity triggered by police protection, "we must consider whether Officer Williamson's actions furthered enforcement of the law, not whether he was off duty when his actions occurred."). Further, the Chief also testified that if no officers were available, Town would recommend that the requesting resident call a private security company to coordinate the security services. Given each of these facts, including the ability of a private security firm to perform the services, for one citizen, when Town declined to, McCullers' off-duty status, and the lack of connection between Town's coordination service and "police protection," I cannot conclude the activity was a "purely governmental matter[] solely for the public benefit." *Tooke*, 197 S.W.3d at 343.

*Guillory v. Port of Houston Authority*, 845 S.W.2d 812 (Tex. 1993), relied upon by my concurring colleague, does not compel a different conclusion. In concluding the Port Authority was a political subdivision of the State that could act only in a governmental rather than proprietary capacity, the *Guillory* court rejected the possibility that the Authority waived its immunity through proprietary conduct. *Id.* at 812–13. In *dicta*, it then built on the impossibility of waiver premised on an expansive definition of proprietary functions proposed by Guillory, which turned on

9

whether a private entity could have provided the service at issue—leasing a truck used for unloading cargo. *Id.* at 814. In contrast, my conclusion does not rest on whether a private entity could have coordinated the security services at issue but instead, considers the discretionary nature of the function as well as the additional factors discussed above and below.

When the statute does not expressly designate a specific municipal activity as either proprietary or governmental, we consider the following four factors in making that determination: "(1) was the City's act 'mandatory or discretionary,' (2) was the City's act 'intended to benefit the general public or the City's residents,' (3) was the City 'acting on the State's behalf or its own behalf' in undertaking the activity; and (4) was the City's act 'sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary.'" *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 705 (Tex. 2019) (quoting *Wasson II*, 559 S.W.3d at 150). These *Wasson* factors also support a conclusion that in providing private security services, Town was acting in a proprietary role. Town admits its coordination of these services was discretionary and the services were for the benefit of Town's residents. Moreover, and key to our inquiry regarding Town's relationship to the State with respect to the task in question and the role of immunity, we have no evidence nor any argument that in coordinating private security services, Town acted on the State's behalf. And finally, given the

10

supreme court's caution that we may treat a proprietary action as governmental under the final *Wasson* factor only if the action is "closely related to or necessary for performance of" the activity described in the statute,[5] I cannot conclude that even this last factor supports the existence of governmental action here. *See Wasson II*, 559 S.W.3d at 150.

Particularly in the summary judgment posture applicable to an evidentiary challenge to jurisdiction, where we resolve all doubts in favor of jurisdiction and construe the facts and pleadings liberally in favor of the non-movant, I would affirm the trial court.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

191431DF.P05

---

[5] *Wasson II*, 559 S.W.3d at 153; *see also City of Helotes v. Page*, No. 04-19-00437-CV, 2019 WL 6887719, at *4 (Tex. App.—San Antonio Dec. 18, 2019, pet. denied).

11