# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0423

═══════════

HAYS STREET BRIDGE RESTORATION GROUP, PETITIONER,

v.

CITY OF SAN ANTONIO, RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

═══════════════════════════════

**Argued September 13, 2018**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The primary issue before us is whether the waiver of governmental immunity for certain

claims provided by the Local Government Contract Claims Act[1] ("the Act") at the time this case

arose[2] applies when the remedy sought is specific performance rather than money damages. We hold

---

[1] TEX. LOC. GOV'T CODE §§ 271.151–.160.

[2] This case centers on a Memorandum of Understanding executed in 2002. At that time, the Act applied to "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 1, sec. 271.151(2), 2005 Tex. Gen. Laws 1548, 1548 (current version at TEX. LOC. GOV'T CODE § 271.151(2)(A)). In 2013, the Legislature amended Section 271.153 of the Act to add Subsection (c), which states: "Actual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B)." Act of May 24, 2013, 83rd Leg., R.S., ch. 1138, § 3, sec. 271.153, 2013 Tex. Gen. Laws 2756, 2758. The referenced provision added to the contracts covered by the Act: "a written contract, including a right of first refusal, regarding the sale or delivery of not less than 1,000 acre-feet of reclaimed water by a local governmental entity intended for industrial use." Id. § 2, sec. 271.151(2), 2013 Tex. Gen. Laws at 2757–2758 (codified as TEX. LOC. GOV'T CODE § 271.151(2)(B)). The 2013 amendments "apply [only] to a claim that arises under a contract executed on or after [their] effective date", and "[a] claim that arises under a contract

that it does and thus reverse the judgment of the court of appeals[3] and remand the case to that court

for further proceedings.

## I

The Hays Street Bridge is a historic cultural landmark in San Antonio. Built in the 1880s,

the wrought-iron truss bridge[4] consists of two spans, a 225-ft Phoenix Whipple span,[5] and a 130-ft

Pratt span,[6] resting on columns made by the Pennsylvania Phoenix Iron Company. The Bridge was

---

executed before [their] effective date . . . is governed by the law in effect on the date the contract was executed". *Id.* § 4(c), 2013 Tex. Gen. Laws at 2758. Thus, we do not consider the effect of these amendments on the issue before us. *See also Lubbock Cty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 301 n.5 (Tex. 2014) (declining to consider the 2013 amendments in a suit for breach of a lease executed in 2007 and renewed in 2010).

[3] 551 S.W.3d 755.

[4] "A truss bridge is a bridge whose load-bearing superstructure is composed of a truss, a structure of connected elements usually forming triangular units. The connected elements (typically straight) may be stressed from tension, compression, or sometimes both in response to dynamic loads. Truss bridges are one of the oldest types of modern bridges." *Truss Bridge*, WIKIPEDIA, https://en.wikipedia.org/wiki/Truss_bridge (last visited Mar. 7, 2019).

[5] "A Whipple truss, named after its inventor Squire Whipple, is usually considered a subclass of the Pratt truss because the diagonal members are designed to work in tension. The main characteristic of a Whipple truss is that the tension members are elongated, usually thin, and at a shallow angle, and cross two or more bays (rectangular sections defined by the vertical members)." *Id.*



[6] "A Pratt truss includes vertical members and diagonals that slope down towards the center . . . . The interior

2

transported to San Antonio in 1910 to provide passage over railroad tracks that eventually were operated by Union Pacific Railroad and is viewed by many residents as the gateway to the City's historically black neighborhoods east of downtown.

By the early 1980s, the Bridge had become unsafe for vehicles or pedestrians. The City ordered it closed, and Union Pacific Railroad made plans to demolish it. But a group of residents formed the Hays Street Bridge Restoration Group to persuade the City to preserve and restore the Bridge for community use. The Restoration Group envisioned that the land surrounding the Bridge —including a then-privately owned 1.7-acre tract on 803 North Cherry Street, near the northeast end of the Bridge—would be acquired and developed to feature the Bridge as a cultural attraction by affording space for parking, educational facilities, restrooms, a park, and a hike-and-bike trail.

To fund the project, the City obtained a $2.89 million federal grant administered by the Texas Department of Transportation. The funding agreement between the City and the Department described the scope of the project as "the rehabilitation and conversion of the abandoned automobile viaduct and iron truss bridge to a pedestrian and biking bridge over the Union Pacific Railroad tracks." The agreement required the City to fund 20% of the project's estimated cost.

In 2002, the City and the Restoration Group executed a Memorandum of Understanding (MOU) "to outline each party's responsibilities" with respect to funding the project. The Restoration

---

diagonals are under tension under balanced loading and vertical elements under compression. . . . The Pratt truss was invented in 1844 by Thomas and Caleb Pratt." *Id.*



Group promised to "[c]ontinue to raise matching funds through grant applications and other private resources" and to "[t]imely transfer" the funds to the City. In exchange, the City promised to "[e]nsure that any funds generated by the Restoration Group . . . [would] go directly to the approved City of San Antonio budget . . . for the Hays Street Bridge project".

Over the next decade, the Restoration Group raised and transferred to the City more than $189,000 in cash and arranged for significant in-kind donations, including the Bridge itself by the Railroad and the Cherry Street property by its private owners. The City finished restoring the Bridge in 2010 but then decided not to use the Cherry Street property for a park. Instead, in 2012, it adopted an ordinance authorizing the sale of the property to Alamo Beer Company for $295,000 as part of an economic-incentive package to induce Alamo to construct a microbrewery, restaurant, and event space that would create jobs and generate tax revenue for the City. As part of the package, the City would return the $295,000 to Alamo as part of a landscape-improvement grant.

The Restoration Group sued, alleging that a transfer of the Cherry Street property to Alamo would breach the City's promise in the MOU to apply "funds" raised by the Restoration Group "directly" to the City's "budget . . . for the Hays Street Bridge project". The City denied that the property was "funds" within the meaning of the MOU. The trial court concluded that "funds" was ambiguous and asked the jury whether the parties intended that it "include[] only donations of money"—the jury answered "no"—or "donations of money and in-kind contributions" (emphasis in original)—the jury answered "yes". The jury also found that the Cherry Street property was "subject to the terms of the MOU" and that the City "failed to comply with the MOU with respect to the [property]".

4

The Restoration Group also sought a declaratory judgment that the City's proposed sale of the Cherry Street property was a transfer of park land requiring voter approval.[7] But the jury failed to find that the City "owned, held or claimed" the Cherry Street property "as a . . . park", and the trial court denied declaratory relief. The Restoration Group does not complain of the trial court's judgment.

For its breach of contract claim, the Restoration Group sought only specific performance. In rendering judgment on the verdict, the trial court found that "specific performance [was] appropriate" because "[t]he unique purpose and circumstances of the [MOU could not] be adequately remedied by monetary damages". The court therefore ordered the City to "allocate, apply and use all funds raised by" the Restoration Group, "including" the Cherry Street property, "by applying said funds directly to the approved" City budget "for the Hays Street Bridge project costs."

Following the rendition of judgment in September 2014, the City proceeded with its plan to sell the Cherry Street property to Alamo, which had been on hold during the litigation. The plan approved in a new ordinance retained the return of the sales proceeds to Alamo as a landscape-improvement grant, as proposed two years earlier. The Restoration Group contended that the plan was prohibited by the judgment and moved to have the City held in contempt. Before the motion was heard, the City appealed the judgment, thereby staying its enforcement.[8]

---

[7] *See* TEX. LOC. GOV'T. CODE § 253.001(b) ("Land owned, held, or claimed as a public square or park may not be sold unless the issue of the sale is submitted to the qualified voters of the municipality at an election and is approved by a majority of the votes received at the election . . . ."); *id.* § 253.001(f) (providing exceptions to the voter-approval rule in (b)).

[8] *See* TEX. CIV. PRAC. & REM. CODE § 6.002(b) (authorizing municipalities to "appeal from judgment without giving supersedeas or cost bond").

The court of appeals concluded that the City was immune from suit, reversed the trial court's judgment, and rendered judgment dismissing the case for lack of jurisdiction.[9] The court held that "the City's functions under the [MOU] are purely governmental," not proprietary,[10] and that the Act does not waive the City's immunity from suit for specific performance of a contract.[11] Because the immunity argument was dispositive, the court did not address other reasons for reversal urged by the City.[12] We granted the Restoration Group's petition for review.[13]

## II

At the outset, we must address the City's claim, asserted for the first time 17 days before oral argument in this Court, that the case has been moot the entire four years it has been on appeal because the City complied with the trial court's judgment a few weeks after it was rendered.

The timing of the motion is troubling. It does not suggest that the posture of the case has changed in any way during the appeal. Asked at oral argument to explain the City's delay in raising the issue, counsel responded: "We were pursuing a judgment reversing [the trial court's denial of] our claim to governmental immunity in connection with the specific performance claim. We wanted a judgment on that. We wanted to get that taken care of." But "when a judgment debtor voluntarily . . . satisfies a judgment rendered against him, the cause becomes moot. He thereby

---

[9] 551 S.W.3d 755, 763–764.

[10] *Id.* at 763.

[11] *Id.* at 762–763.

[12] *Id.* at 763.

[13] 61 Tex. Sup. Ct. J. 1212 (June 1, 2018).

waives his right to appeal and the case must be dismissed."[14] Either the City lacks confidence in its mootness argument, or it has invoked appellate jurisdiction it believes does not exist to obtain a judgment to which it is not entitled.

The motion offers no support for its assertions other than a half-page document captioned "Declaration of Lori Houston", whom the document identifies as the City's Assistant City Manager. The declaration is unverified, and while it states that it is made under penalty of perjury, it lacks the statutorily required jurat for a declaration in lieu of an affidavit.[15] As such, it provides no support for the motion. Further, the declaration states that "[t]he City sold the property to the Alamo Beer Company LLC for $291,522.37." In fact, as the Restoration Group points out in response, the City deeded the property to Simor Texas Land Company, LLC. The City dismisses the discrepancy, explaining that the grantee is Alamo's parent, but the explanation, like the Houston declaration, is neither verified nor supported by any evidence. The declaration continues: "The sale proceeds were credited to the City's account for the Hays Street Bridge Restoration Project." The unverified, conclusory statement cannot be taken at face value.

But even more importantly, the City's motion to dismiss and the Restoration Group's response, along with the Restoration Group's motion for contempt in the trial court, establish that the City's post-judgment actions have not mooted the case. "A case is moot when either no 'live' controversy exists between the parties, or the parties have no legally cognizable interest in the

---

[14] *Highland Church of Christ v. Powell*, 640 S.W.2d 235, 236 (Tex. 1982) (citing *Emps. Fin. Co. v. Lathram*, 369 S.W.2d 927, 930 (Tex. 1963)).

[15] *See* TEX. CIV. PRAC. & REM. CODE § 132.001(d) (providing that an unsworn declaration used in lieu of an affidavit must include a jurat in substantially the prescribed form, which includes the declarant's date of birth). The declaration does not include Houston's date of birth.

7

outcome. 'Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests.'"[16] The parties vigorously dispute whether the City has satisfied the judgment, and the resolution of the dispute will affect their rights. The City argues that the Cherry Street property had to be monetized because the judgment identified it as "funds" and required that it be "allocate[d], appl[ied], and use[d]" by being applied directly to the City's budgeted costs. The judgment could be satisfied, the City contends, only if the property was sold. But the jury found that the parties intended "funds" to include in-kind contributions, and it is not clear that the property could be applied to the project only by being sold. The Restoration Group argues that even if the judgment allowed the sale of the property, the City has not allocated the proceeds to project costs as required. In sum, the parties continue to dispute factual and legal issues.

A party's failure to prevail on a claim or defense does not mean that it was moot from the beginning. The City claims to have satisfied the judgment, but the Restoration Group's contrary contentions remain viable. At this point, the case is not moot. The City's motion is denied.

### III

We turn now to the main issue: whether the City is immune from suit for specific performance of its promise in the MOU to "[e]nsure that any funds generated by the Restoration Group . . . go directly to the approved City . . . budget . . . for the Hays Street Bridge project". "Our caselaw . . . prescribes a relatively simple two-step process for addressing the applicability of

---

[16] *City of Krum v. Rice*, 543 S.W.3d 747, 749 (Tex. 2017) (per curiam) (internal citation omitted) (quoting *Heckman v. Williamson County*, 369 S.W.3d 137, 162 (Tex. 2012)).

8

immunity."[17] First, we "determine[] the applicability of immunity in the first instance".[18] Because governmental immunity is a common-law doctrine, determining its existence, we recently reaffirmed, "has historically been, and is now" a job solely for the judiciary.[19] Second, if immunity exists, then we look to statutory law to determine whether the Legislature has waived it.[20]

## A

Under the common law, "no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent."[21] Centuries ago, the justification for the rule was that "the king can do no wrong".[22] Modern justifications are more practical. Sovereign immunity protects the state and its divisions, while governmental immunity protects political subdivisions.[23] Immunity "shield[s] the public from the costs and consequences of improvident actions of their governments."[24] Immunity "protects the State from lawsuits for money damages"[25] but also from

---

[17] *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 435 (Tex. 2016).

[18] *Id.*

[19] *Id.* at 432.

[20] *See id.* at 432, 435.

[21] *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (quoting *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847)).

[22] *Id.* (citing 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 254 (1768)).

[23] *Harris County v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018).

[24] *Tooke*, 197 S.W.3d at 332.

[25] *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). "[S]afeguarding the treasury is one of sovereign immunity's primary justifications in the modern era", *Nazari v. State*, 561 S.W.3d 495, 508 (Tex. 2018), but it is not the only one.

9

"other forms of relief"[26] and from "shifting tax resources away from their intended purposes toward defending lawsuits".[27] Immunity protects the government not just from judgments but from suit— "from the distraction and expenses that would ensue if citizens could sue the government whenever they pleased."[28] Our earliest cases recognizing the doctrine confirm that immunity is implicated by any suit that seeks to control governmental action. "Immunity . . . protects the public as a whole."[29] "And while inherently connected to the protection of the public fisc, sovereign immunity preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars."[30]

Thus, while the Restoration Group seeks only specific performance and not money damages, the City may be immune from suit. The fundamental question is whether a suit is "against the state".[31] Our jurisprudence has recognized only two categories of suits against the government that ultimately are not. The first is a suit alleging that a governmental official acted *ultra vires*.[32] The

---

[26] *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

[27] *IT-Davy*, 74 S.W.3d at 854.

[28] *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 382 (Tex. 2006) (Brister, J., concurring) (citing *IT-Davy*, 74 S.W.3d at 854; *Bd. of Land Comm'rs v. Walling*, Dallam 524, 526 (Tex. 1843) ("The experience of ages and the wisdom of the most enlightened statesmen and judicial expositors have sanctioned the doctrine, that less injury would arise from the delay or even the denial of justice to individuals, than from the distraction and imbecility consequent upon the government's being involved in continual and harassing controversies, at the will or caprice of every citizen in the community.")).

[29] *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 839 (Tex. 2018).

[30] *Brown & Gay Eng'g, Inc.*, 461 S.W.3d at 121.

[31] *Herring v. Hous. Nat'l Exch. Bank*, 253 S.W. 813, 814 (Tex. 1923).

[32] *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 433 (Tex. 2016) (explaining that immunity does not protect *ultra vires* acts "because acts done 'without legal authority' are not done as a branch of the state" (quoting *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016))).

second, which we must consider here, is a suit challenging the acts of a municipality that are proprietary, rather than governmental, in nature.[33]

Our recent opinions in *Wasson Interests, Ltd. v. City of Jacksonville*, issued in 2016 ("*Wasson I*")[34] and last Term ("*Wasson II*"),[35] govern the analysis of whether municipal action challenged in a breach-of-contract case is proprietary or governmental. In *Wasson I*, we explained that even in breach-of-contract cases, "courts should be guided . . . by the [Tort Claims Act's] treatment of the proprietary-governmental distinction."[36] In *Wasson II*, we clarified that in answering the proprietary versus governmental question, "the focus belongs on the nature of the contract, not the nature of the breach."[37] Our opinion then demonstrates the proper analysis.

The first question is whether the lists of governmental and proprietary functions in Section 101.0215 of the Tort Claims Act include the kind of contract at issue.[38] Next, "we . . . apply the general definitions" in the Act.[39] The Act defines "governmental functions" as "those functions that are enjoined on a municipality by law and are given [to] it by the state as part of the state's

---

[33] *See id.*

[34] 489 S.W.3d 427.

[35] 559 S.W.3d 142 (Tex. 2018).

[36] 489 S.W.3d at 439; *see Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 452 (Tex. 2016) ("In *Wasson*, we reaffirmed the appropriateness of deferring to the TTCA when classifying acts in the contract-claims context.").

[37] 559 S.W.3d at 149.

[38] *See id.* at 150 ("Because the Tort Claims Act does not enumerate leasing property as a governmental or a proprietary function, we must apply the general definitions."); TEX. CIV. PRAC. & REM. CODE § 101.0215(a)–(b) (providing examples of governmental and proprietary functions).

[39] *Wasson II*, 559 S.W.3d at 150.

11

sovereignty, to be exercised by the municipality in the interest of the general public,"[40] and "proprietary functions" as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality".[41] We fleshed out those definitions by considering four factors:

> whether (1) the City's act of entering into the [contract] was mandatory or discretionary, (2) the [contract was] intended to benefit the general public or the City's residents, (3) the City was acting on the State's behalf or its own behalf when it entered the [contract], and (4) the City's act of entering into the [contract] was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary.[42]

Finally, we noted that when "some factors . . . point to one result while others point to the opposite result", "courts should consider immunity's nature and purpose and the derivative nature of a city's access to that protection."[43]

We issued *Wasson II* after the court of appeals rendered its judgment in this case, but the analysis we set out there squarely supports the court of appeals' conclusion that the City's functions under the MOU were governmental. The MOU was made to support the City–State funding agreement for restoration of the Bridge and revitalization of the surrounding area. The City argues that the MOU fits within two categories of governmental functions enumerated in Section

---

[40] TEX. CIV. PRAC. & REM. CODE § 101.0215(a).

[41] *Id.* § 101.0215(b).

[42] *Wasson II*, 559 S.W.3d at 150.

[43] *Id.* at 154.

12

101.0215(a): "bridge construction and maintenance"[44] and "community development or urban renewal activities".[45] We agree.[46]

The general definitions in the Act, when fleshed out by the *Wasson II* factors, also support classifying the MOU as an agreement relating to governmental, rather than proprietary, functions. Only the first factor, whether the agreement was mandatory or discretionary on the part of the City, supports classifying the City's functions under it as proprietary. Though the City's funding agreement with the State required it to fund 20% of the project's estimated cost, the City's decision to enlist the Restoration Group's help in raising the money was discretionary.[47]

The remaining three factors all point to classifying the City's functions under the MOU as governmental. Restoration of the Bridge and revitalization of the surrounding area were intended to benefit the general public, not just City residents.[48] The Restoration Group concedes as much in its brief on the merits by describing the Bridge as an "important cultural and engineering landmark" that it wanted to restore "for the enjoyment and education of San Antonio residents *and visitors*".

---

[44] TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(4).

[45] *Id.* § 101.0215(a)(34).

[46] Section 101.0215(a)(34) lists "community development or urban renewal activities undertaken by municipalities *and authorized under Chapters 373 and 374, Local Government Code*". *Id.* (emphasis added). The Restoration Group argues that this limitation renders the provision inapplicable here. Because we consider the Legislature's classification of governmental and proprietary functions in the Tort Claims Act to be guidance in the contract-claims context—rather than binding lists to be interpreted narrowly—we disagree. *Wasson I*, 489 S.W.3d 427, 439 (Tex. 2016); *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 452 (Tex. 2016).

[47] *See Wasson II*, 559 S.W.3d at 150–151 (explaining that the City of Jacksonville's discretionary decision to lease lakefront property to the Wasson family supported the Court's conclusion that the city acted in its proprietary capacity by entering into the lease).

[48] *See id.* at 151 ("Generally, a city's governmental functions benefit the general public and its proprietary functions benefit its own residents." (citing TEX. CIV. PRAC. & REM. CODE § 101.0215(a))).

13

Eighty percent of the restoration project was funded by the Texas Department of Transportation.[49] And finally, the specific purpose of the MOU—"outlin[ing] each party's responsibilities" with respect to raising 20% of the estimated project costs—is, as we have already acknowledged, "sufficiently related to . . . governmental function[s]"[50] listed in Section 101.0215(a). We hold that the City acted in its governmental capacity when it entered the MOU and therefore enjoyed immunity from suit "in the first instance".[51]

## B

The next issue is whether the Local Government Contract Claims Act waives the City's immunity.[52] It is undisputed that the City is a "local governmental entity" to which the Act applies, and the MOU is contract subject to the Act.[53]

Section 271.152 of the Local Government Code "waives" the City's "sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract," but only "subject to the terms and conditions of" the Act.[54] In *Zachry Construction Corp. v. Port of Houston Authority of Harris County*, we explained that the "subject to" phrase "incorporates the other provisions of the

---

[49] *See id.* at 152 (examining the third factor, whether the City acted on its own behalf or the State's when entering the contract at issue).

[50] *See id.* at 150.

[51] *Wasson I*, 489 S.W.3d at 435.

[52] *See id.* ("If immunity is applicable, *then* the judiciary defers to the legislature to waive such immunity." (citing *Tooke v. City of Mexia*, 197 S.W.3d 325, 332–333 (Tex. 2006))).

[53] *See* TEX. LOC. GOV'T CODE § 271.151(2)–(3).

[54] *Id.* § 271.152.

Act to define the scope of its waiver of immunity."[55] Stated more succinctly, "the [other] provisions of the Act [are] limitations on the waiver of immunity."[56]

The "other provision" applicable here is Section 271.153. When the Restoration Group filed suit in 2012, Section 271.153 provided:

**§ 271.153. Limitations on Adjudication Awards**

(a) *The total amount of money awarded* in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter *is limited to* the following:

(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;

(3) reasonable and necessary attorney's fees that are equitable and just; and

(4) interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

(b) *Damages awarded* in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter *may not include*:

(1) consequential damages, except as expressly allowed under Subsection (a)(1);

(2) exemplary damages; or

---

[55] 449 S.W.3d 98, 108 (Tex. 2014).

[56] *Id.*

15

(3) damages for unabsorbed home office overhead.[57]

Relying on our holding in *Zachry* that "the Act does not waive immunity from suit on a claim for *damages* not recoverable under Section 271.153",[58] the court of appeals reasoned that because the only remedy claimed by the Restoration Group and awarded by the trial court was specific performance, and Section 271.153 does not mention specific performance, the Act does not waive the City's immunity from suit for the Restoration Group's claim.[59]

But Section 271.153 limits damages, not remedies. Damages is "[m]oney".[60] An award of damages is a legal remedy.[61] "Specific performance", by contrast, "is an equitable remedy that lies within the court's discretion to award whenever . . . damages would be inadequate or . . . could not possibly be established."[62] Damages and specific performance are alternatives to one another.[63]

*Zachry* does not answer the question presented here: whether Section 271.153 foreclosed the

---

[57] Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 1, sec. 271.153, 2005 Tex. Gen. Laws 1548, 1549 (emphases added to (b)) (enacting Section 271.153); Act of May 19, 2011, 82nd Leg., R.S., ch. 226, § 1, sec. 271.153(a), 2011 Tex. Gen. Laws 809 (emphases added to (a)) (amending Section 271.153(a)) (amended 2013). The 2011 amendments took effect on September 1, 2011, and were made applicable "to an adjudication commenced on or after the effective date of [the] Act." *Id.* §§ 2–3.

[58] 449 S.W.3d at 110 (emphasis added).

[59] 551 S.W.3d 755, 762–763.

[60] *Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Money claimed by, or ordered to be paid to, a person as compensation for loss or injury").

[61] *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 284 (Tex. 2004).

[62] *Specific Performance*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see* 25 RICHARD A. LORD, WILLISTON ON CONTRACTS § 67:1 (4th ed. 2002) ("An action for specific performance is equitable in nature".).

[63] *See, e.g.*, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 423 (Tex. 2011) ("Because an adequate remedy at law exists, we agree with the court of appeals that the availability of a legal remedy foreclosed Sharyland's suit for an injunction or specific performance.").

Restoration Group's suit for specific performance. We hold that it did not. This is evident from the statute's plain text. Section 271.153(a) limits "[t]he total amount of money awarded" to enumerated categories of damages. Subsection (b) clarifies that "[d]amages awarded" against a local governmental entity "may not include" certain additional categories. Neither mentions any equitable remedy. To read former Section 271.153 as impliedly prohibiting every suit seeking an equitable remedy against a local governmental entity would too greatly restrict the general waiver of immunity in Section 271.152.[64]

Accordingly, we conclude that the Act waives the City's immunity from suit on the Restoration Group's claim for specific performance.[65]

\* \* \* \* \*

We therefore reverse the court of appeals' judgment and remand the case to that court for consideration of the City's remaining arguments.

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: March 15, 2019

---

[64] *See Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) ("We must not interpret the statute 'in a manner that renders any part of the statute meaningless or superfluous.'" (quoting *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008))).

[65] The City argues that 2013 amendments to the Act waiving immunity for specific performance of one type of contract indicates that immunity is not waived for any other. As we noted at the outset, the amendments applied only prospectively and do not apply here to the Restoration Group's claim on the 2002 MOU. *See supra* note 2. Accordingly, we do not address the merits of this argument.