# Supreme Court of Texas

No. 21-0307

City of League City, Texas,
*Petitioner*,

v.

Jimmy Changas, Inc.,
*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued October 4, 2022**

JUSTICE BOYD delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Devine, Justice Busby, Justice Huddle, and Justice Young joined.

JUSTICE YOUNG filed a concurring opinion.

JUSTICE BLACKLOCK filed a dissenting opinion, in which Justice Bland joined as to Part III.

This interlocutory appeal involves the thorny governmental/proprietary dichotomy in a breach-of-contract context. The court of appeals held that governmental immunity does not protect a city against a breach-of-contract claim because the city was acting in

its proprietary capacity when it entered into the contract. We agree and affirm.

## I.
## Background

The Texas Local Government Code authorizes cities to grant and loan public funds for various beneficial purposes. Chapter 373, for example, permits municipal expenditures for "community development" purposes, including the "elimination of slums and areas affected by blight" and the "prevention of blighting influences and of the deterioration of property and neighborhood and community facilities important to the welfare of the community." TEX. LOC. GOV'T CODE § 373.002(b). Similarly, chapter 374 authorizes cities to fund "urban renewal" programs "to encourage urban rehabilitation" and "to provide for the redevelopment of slum and blighted areas." *Id.* § 374.013(a).

This dispute involves an "Economic Development Incentives Grant Agreement" under chapter 380, which permits cities to provide "economic development" incentives "to promote state or local economic development and to stimulate business and commercial activity in the municipality." *Id.* § 380.001(a). The Agreement describes plans by Jimmy Changas, Inc. to invest $5 million to construct a 10,000-square-foot restaurant facility on a particular tract within the City of League City's entertainment district. Jimmy Changas projected the facility would be at least equal in quality to an existing Jimmy Changas restaurant in Pasadena, Texas, and would create at least eighty full-time and forty part-time jobs. League City agreed that, if Jimmy

2

Changas completed the facility as projected,[1] the City would reimburse all of Jimmy Changas's capital-recovery fees for water and wastewater services, all fees Jimmy Changas would pay to obtain plat approvals and building permits, and a percentage of Jimmy Changas's local-sales-tax payments based on the restaurant's total annual sales.

Consistent with chapter 380's authorization, the Agreement recited that its purposes were "to promote state or local economic development and to stimulate business and commercial activity in the City," to "contribute to the economic development of the City by generating employment and other economic benefits to the City," and to encourage Jimmy Changas to develop the property "in a manner that establishes the area as a regional destination."

After Jimmy Changas completed the project, League City refused to provide the reimbursements, contending that Jimmy Changas failed to timely submit documentation establishing it had invested at least $5 million and created at least eighty full-time jobs. Jimmy Changas contends it submitted all the required documentation and that the City waived any complaint about the timeliness of its submission by continuously requesting additional documents beyond those Jimmy Changas initially submitted.

Jimmy Changas filed this suit asserting that League City breached the Agreement by refusing to pay the promised reimbursements. The City filed a plea to the jurisdiction, arguing that

---

[1] The Agreement did not require Jimmy Changas to build and operate the restaurant as projected, but it conditioned the City's incentive payments on its doing so.

governmental immunity bars the claim and that no statute waives that immunity. The trial court denied the plea, and the City filed an interlocutory appeal.[2] The court of appeals affirmed, holding that governmental immunity does not apply to Jimmy Changas's claim because League City was acting in its proprietary capacity—as opposed to its governmental capacity—when it entered into the Agreement. 619 S.W.3d 819, 828 (Tex. App.—Houston [14th Dist.] 2021). We granted the City's petition for review and now affirm.

## II.
## Governmental and Proprietary Functions

To "shield the public from the costs and consequences of improvident actions of their governments," sovereign immunity generally bars claims against the State and its agencies. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Municipal corporations often function in a governmental capacity on the State's behalf but at other times function as "a private corporation," *City of Tyler v. Ingram*, 164 S.W.2d 516, 519 (Tex. 1942), "for the private advantage and benefit of the locality and its inhabitants." *Wasson Ints., Ltd. v. City of Jacksonville* (*Wasson I*), 489 S.W.3d 427, 433 (Tex. 2016). Because "sovereign immunity is inherent in the State's sovereignty," municipalities "share that protection when they act 'as a branch' of the

---

[2] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (permitting interlocutory appeal from an order that "grants or denies a plea to the jurisdiction by a governmental unit"). The City also filed a summary-judgment motion and a counterclaim to recover its attorney's fees and expenses. The trial court denied summary judgment, but we do not address that ruling in this interlocutory appeal.

4

State but not when they act 'in a proprietary, non-governmental capacity.'" *Wasson Ints., Ltd. v. City of Jacksonville* (*Wasson II*), 559 S.W.3d 142, 146 (Tex. 2018) (quoting *Wasson I*, 489 S.W.3d at 430).

The common law has long recognized this dichotomy when cities are sued in tort, and we held in *Wasson I* that it also applies when cities are sued for breach of contract. *See Wasson I*, 489 S.W.3d at 439. To determine whether a municipality engaged in a governmental or proprietary function when it entered into a particular contract, we look to both the common law and to Texas statutes.

## A. Common-law definitions

Under the common law, proprietary functions are those that a city performs "in its discretion," "primarily for the benefit of those within the corporate limits of the municipality," and not as "an arm of the government" or "a branch of the state" or "under the authority, or for the benefit, of the sovereign." *Wasson II*, 559 S.W.3d at 147 (quoting *Wasson I*, 489 S.W.3d at 427; *Gates v. City of Dallas*, 704 S.W.2d 737, 739 (Tex. 1986); *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949)). Proprietary functions "can be, and often are, provided by private persons." *Id.* (quoting Joe R. Greenhill & Thomas V. Murto III, *Governmental Immunity*, 49 TEX. L. REV. 462, 463 (1971)).

Governmental functions under the common law are those that involve "the performance of purely governmental matters solely for the public benefit," are "normally performed by governmental units," and are performed "as a branch of the state—such as when a city 'exercise[s] powers conferred on [it] for purposes essentially public . . . pertaining to the administration of general laws made to enforce the general policy of

5

the state.'" *Id.* (quoting *Wasson I*, 489 S.W.3d at 433 (in turn quoting *City of Galveston v. Posnainsky*, 62 Tex. 118, 127 (1884)); *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (in turn quoting *Dilley*, 222 S.W.2d at 993); Greenhill & Murto, 49 TEX. L. REV. at 463).

## B. Statutory definitions

The Texas Constitution specifically authorizes the legislature to define governmental and proprietary functions "for all purposes." TEX. CONST. art. XI, § 13. Exercising this authority, the legislature has addressed the dichotomy for purposes of tort claims but not for claims for breach of contract. Generally consistent with the common-law descriptions, the Tort Claims Act defines proprietary functions as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality." TEX. CIV. PRAC. & REM. CODE § 101.0215(b). Statutorily, proprietary functions include, but are not limited to, "the operation and maintenance of a public utility," "amusements owned and operated by the municipality," and "any activity that is abnormally dangerous or ultrahazardous." *Id.*

By contrast, the Act defines governmental functions as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Id.* § 101.0215(a). In addition to this general definition, the Act includes a non-exclusive list designating thirty-six specific activities as governmental functions, ranging from "police and fire protection and control" to "animal control." *Id.* § 101.0215(a)(1), (33).

6

## C. Application to contract claims

"Although these statutory definitions and designations apply expressly to tort claims, we explained in *Wasson I* that they can also 'aid our inquiry' when applying the dichotomy in the contract-claims context." *Wasson II*, 559 S.W.3d at 147–48 (quoting *Wasson I*, 489 S.W.3d at 439). "We thus consider" in contract cases "both the statutory provisions and the common law in determining whether a city's contractual conduct is governmental or proprietary." *Id.* at 148.

If a particular activity is not included in the statutory list of governmental functions, we look to the general definitions under both the common law and the statute. *Id.* at 150. Based on those definitions, we consider the following four factors: (1) whether the city's act of entering into the contract was mandatory or discretionary, (2) whether the contract was intended to benefit the general public or the city's residents, (3) whether the city was acting on the State's behalf or its own behalf when it entered the contract, and (4) whether the city's act of entering into the contract was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary. *Id.*[3]

---

[3] Our dissenting and concurring colleagues do not dispute that we have recognized the governmental/proprietary distinction as fundamental to the inherent nature of a municipal corporation for nearly as long as this Court has existed. *See, e.g.*, *Keller v. City of Corpus Christi*, 50 Tex. 614, 622 (1879) (explaining that "municipal corporations possess a double character,—the one, governmental, legislative, or public; the other, proprietary or private,—and that for the acts of their agents in their public capacity no action lies unless it be given by statute; while for other acts done in their private capacity there is an implied or common-law liability"); *Peck v. City of Austin*, 22 Tex. 261, 264 (1858) (explaining that a municipal corporation, "though a municipal

### III.
### League City's Agreement

"The distinction between a municipality's governmental and proprietary functions 'seems plain enough, but the rub comes when it is sought to apply the test to a given state of facts.'" *Id.* at 146–47 (quoting *City of Houston v. Wolverton*, 277 S.W.2d 101, 103 (Tex. 1955)). Under these facts, League City argues that it engaged in a governmental function when it entered into the agreement at issue because (1) its action falls within the statutory list of governmental functions and, (2) even if it doesn't, it falls within the statute's and the common law's general definitions. We disagree with both arguments.

#### A. Statutory list

Among the thirty-six statutorily designated governmental functions, the Tort Claims Act includes "community development or urban renewal activities undertaken by municipalities and authorized under Chapters 373 and 374, Local Government Code." TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(34). League City concedes that it entered

---

government, and therefore public, may also occupy towards individuals the position of a private corporation, and be liable upon its contracts, or for the wrongful acts of its officers, done under its authority, and in pursuance of its will, expressed or implied"); *see also Wasson II*, 559 S.W.3d at 146–47 (citing cases); *Wasson I*, 489 S.W.3d at 433–34 (citing cases). Instead, they question whether the *Wasson* factors provide a proper framework for drawing that distinction. *See post* at __ (YOUNG, J., concurring), __ (BLACKLOCK, J., dissenting). But we did not create the factors out of whole cloth in *Wasson II*. Instead, we derived them directly from a long line of this Court's common-law decisions and the Tort Claims Act's express statutory definitions. *See Wasson II*, 559 S.W.3d at 147–48, 150. No party in this case urges us to reconsider the governmental/proprietary distinction or the considerations we have long relied upon to draw that distinction.

into the Agreement with Jimmy Changas as an economic-development activity under chapter 380 of the Local Government Code and not as a community-development or urban-renewal activity under chapters 373 or 374. Nevertheless, the City contends that subsection (a)(34) encompasses a broad category of "community development" activities and that its Agreement with Jimmy Changas "falls within" that category. In support of this contention, the City relies on the San Antonio Court of Appeals' opinion in *CHW-Lattas Creek, L.P. v. City of Alice*, 565 S.W.3d 779, 786 (Tex. App.—San Antonio 2018, pet. denied), and on a footnote in our opinion in *Hays Street Bridge Restoration Group v. City of San Antonio*, 570 S.W.3d 697, 705 n.46 (Tex. 2019).

As here, *CHW-Lattas Creek* involved an economic-development agreement under chapter 380 between the City of Alice and a developer, CHW. In that agreement, CHW agreed to convey undeveloped land to Alice in exchange for Alice's agreement to develop the property by constructing, among other things, an aquatics center, amphitheater, conference center, and hotel. 565 S.W.3d at 782–83. Relying primarily on legislative history rather than on subsection (a)(34)'s plain language, the court concluded that subsection (a)(34) specifies activities under chapters 373 and 374 only "because the two cases in which courts had found community development activities to be proprietary involved community development activities undertaken under those two chapters." *Id.* at 786 (citing *City of Houston v. Sw. Concrete Constr., Inc.*, 835 S.W.2d 728 (Tex. App.—Houston [14th Dist.] 1992, writ denied); *Josephine E. Abercrombie Ints., Inc. v. City of Houston*, 830 S.W.2d 305 (Tex. App.—Corpus Christi–Edinburgh 1992, writ denied)). The court

9

held that Alice was engaged in a governmental function when it entered into the economic-development contract under chapter 380 because subsection (a)(34) includes "all community development activities regardless of which chapter of the Local Government Code applies." *Id.*

We disagree with the *CHW-Lattas Creek* court's construction of subsection (a)(34). "A statute's unambiguous language 'is the surest guide to the Legislature's intent,' because 'the Legislature expresses its intent by the words it enacts and declares to be the law.'" *Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 135–36 (Tex. 2018) (first quoting *Sullivan v. Abraham*, 488 S.W.3d 294, 297 (Tex. 2016), then quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011)). Subsection (a)(34) expressly includes only community-development activities under chapter 373 and urban-renewal activities under chapter 374, and we cannot rewrite the statute by judicially incorporating other types of activities. Although the legislature has specified that local community-development and urban-renewal activities intended to remove "slums" and "blight" qualify as governmental functions, it has never suggested that local economic-development activities intended to promote a local business environment do as well.

Moreover, even if we consider the history of the bill that resulted in subsection (a)(34), we note that the *CHW-Lattas Creek* court overlooked the fact that the bill as introduced would have included "community development activity" without identifying any particular chapter of the Local Government Code. *See* Tex. S.B. 1697, 75th Leg., R.S. 1997 (as introduced). The bill was amended, however, to specify

10

only "community development activities undertaken . . . under Chapter 373," and later amended to also specify urban-renewal activities under chapter 374. Tex. S.B. 1697, 75th Leg., R.S. (1997) (as amended). That the bill began with a broad reference to community-development activities and then narrowed to include only community-development and urban-renewal activities "authorized under" chapters 373 and 374 undercuts the *CHW-Lattas Creek* court's conclusion that the legislature intended a broad definition. *See id.*; *CHW-Lattas Creek*, 565 S.W.3d at 786. We thus disapprove of the *CHW-Lattas Creek* court's construction of subsection (a)(34).[4]

League City contends, however, that our opinion in *Hays Street Bridge* confirms the correctness of the San Antonio court's holding in *CHW-Lattas Creek*. *Hays Street Bridge* involved an agreement in which the City of San Antonio contracted with a group of concerned residents to restore a deteriorated bridge that served as a "historic cultural landmark." 570 S.W.3d at 699. We agreed that the city's actions in entering into the contract fell within the description of community-development and urban-renewal activities in subsection (a)(34), as well as the description of "bridge construction and maintenance" in

---

[4] We do not pass judgment, however, on the *CHW-Lattas Creek* court's ultimate conclusion that the City of Alice was engaged in a governmental function when it entered into the contract at issue in that case. *See* 565 S.W.3d at 787. Even if that contract did not fall within subsection (a)(34)'s description, it concerned many different municipal functions that may otherwise be considered governmental, including "street construction and design," "sanitary and storm sewers," "waterworks," "parks and zoos," "civic, convention centers, or coliseums," and "recreational facilities, including but not limited to swimming pools, beaches, and marinas." TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(1), (9), (11), (13), (16), (23).

11

subsection (a)(4). *Id.* at 705. In doing so, we disagreed with the residents' argument that subsection (a)(34)'s reference to chapters 373 and 374 rendered that subsection inapplicable. *Id.* at 705 n.46.

We did so, however, not because we thought subsection (a)(34) means something different than it says but because the Tort Claims Act's classifications merely serve as "guidance in the contract-claims context—rather than binding lists to be interpreted narrowly." *Id.* We did not hold in *Hays Street Bridge* that any agreement that touches on "community development" falls within subsection (a)(34) such that courts must conclude that a city engaged in a governmental function by entering into such an agreement. Instead, we focused on whether the contract fell under the broader common-law and statutory definitions of a governmental function by considering the *Wasson* factors. *Id.* at 705–06.[5]

Nor can we conclude that economic-development activities under chapter 380 are so similar to community-development and urban-renewal activities under chapters 373 and 374 as to extend subsection (a)(34) by implication. As mentioned, chapter 373 allows municipalities

---

[5] The City also relies on another San Antonio Court of Appeals opinion, which broadly construed subsection (a)(34)'s reference to "community development or urban renewal activities" as "activities which a municipality funds or incentivizes through tax abatements or grants to encourage development . . . ." *City of Helotes v. Page*, No. 04-19-00437-CV, 2019 WL 6887719, at *3 n.3 (Tex. App.—San Antonio Dec. 18, 2019, pet. denied). We need not agree or disagree with this definition but need only note that it does not transform a contract under chapter 380 into a contract under chapter 373 or 374. Indeed, the *Page* court did not hold that it did, but instead relied on the general definitions and applied the *Wasson* factors to conclude that the City of Helotes engaged in a "vendor's fair" as a proprietary function. *See id.* at *3–4.

12

to create "community development program[s]" designed to "improve the living and economic conditions of persons of low and moderate income" and "aid in the prevention or elimination of *slums and blighted* areas," among other things. TEX. LOC. GOV'T CODE § 373.004 (emphasis added). Similarly, chapter 374 enables municipalities to prevent and eliminate *slums and blight* through "the rehabilitation, the conservation, or the slum clearance and redevelopment of the area." *Id.* § 374.011(a)(1) (emphasis added). Chapter 380, on the other hand, permits municipalities to engage in activities "to promote state or local economic development and to stimulate business and commercial activity in the municipality." *Id.* § 380.001(a). Chapter 380 says nothing of slums, blight, or lower-economic living conditions, and League City does not assert that the Agreement was intended to address those concerns.[6]

The stated purpose of the Agreement was "to stimulate business and commercial activity," not to undertake "urban renewal activities," *see id.* § 374.003(25) ("'Urban renewal activities' includes slum clearance, redevelopment, rehabilitation, and conservation activities to prevent further deterioration of an area that is tending to become a blighted or slum area."), or improve conditions of lower-income communities, *see id.* § 373.002(b) (stating that activities taken under this chapter should be "directed toward" "elimination of slums and areas

---

[6] The Comprehensive Annual Financial Report for the City makes no mention of blight or slum neighborhoods. It speaks of the City's low employment rate and its "outstanding neighborhoods, superior schools, parks, trails and waterfront." The City's Economic Development Profile notes the City "continuously ranks among the best communities in the state . . . with the average annual household income of more than $100,000, strong school districts, high community public safety ratings, and abundant recreational activities."

13

affected by blight," "elimination of conditions detrimental to the public health, safety, and welfare," and "alleviation of physical and economic distress through the stimulation of private investment and community revitalization in slum or blighted areas"). As the City itself concedes, the Agreement's main purposes were "creating local jobs and increasing state sales tax revenue." In short, the purpose of the Agreement under chapter 380 was not so similar to the purposes of chapter 373 and 374 activities so as to consider this an agreement for "community development or urban renewal" under subsection (a)(34).

## B. General definitions

When a particular municipal activity is not included in the statutory list of governmental functions, we look to the general definitions to determine whether the activity is "governmental" or "proprietary." *Wasson II*, 559 S.W.3d at 150. Particularly in breach-of-contract cases, we consider "both the statutory provisions and the common law in determining whether a city's contractual conduct is governmental or proprietary." *Id.* at 148. League City argues that, even if its conduct in entering into the Agreement does not fall within subsection (a)(34), it was nevertheless engaged in a governmental function under the general definitions.

As explained, we have identified four factors that summarize both the common-law and the statutory definitions. *Id.* at 150. League City argues that these factors establish it was engaged in a governmental function when it entered into the Agreement with Jimmy Changas. We disagree.

### 1. Discretionary activity

Under the first factor, we consider whether the City's act of entering into the contract was mandatory or discretionary. *Id.* Like the common law, the statutory definitions provide that governmental functions are those that "are enjoined on a municipality by law," while proprietary functions are those that "a municipality may, in its discretion, perform." TEX. CIV. PRAC. & REM. CODE § 101.0215(a), (b).

League City does not dispute that its decision to enter into the Agreement was a discretionary act. Chapter 380 states that municipalities "*may* establish and provide for the administration of one or more programs . . . to promote state or local economic development and to stimulate business and commercial activity in the municipality." TEX. LOC. GOV'T CODE § 380.001(a) (emphasis added). Neither chapter 380 nor any other statute required the City to use public funds to promote economic development or to stimulate local business. This factor clearly weighs in favor of concluding that the City engaged in a proprietary function by entering into the Agreement.

### 2. Primarily for the benefit of City residents

Under the second factor, we consider whether the municipality entered into the contract to benefit the general public or the City's residents. *Wasson II*, 559 S.W.3d at 150. Under the common law, this factor distinguishes a municipal corporation's local purpose to serve its residents from those it may perform "as the agent of the state in furtherance of general law for the interest of the public at large." *City of*

15

*Houston v. Shilling*, 240 S.W.2d 1010, 1011–12 (Tex. 1951).[7] In the same way, the statute distinguishes between proprietary functions a city performs "in the interest of the inhabitants of the municipality" and governmental functions performed "in the interest of the general public." TEX. CIV. PRAC. & REM. CODE § 101.0215(a), (b).

The Agreement between League City and Jimmy Changas expressly and repeatedly states that its purposes were to "stimulate business and commercial activity *in the City*," to "contribute to the economic development *of the City* by generating employment and other economic benefits *to the City*," "to encourage [Jimmy Changas] to develop the [restaurant] in a manner that establishes *the area* as a regional destination," to "promote *local* economic development," and to "raise funds for *the city* budget." [Emphases added.]

Nevertheless, League City contends that it intended the Agreement to benefit the State and all of its citizens because the State would receive most of (and thus be the primary beneficiary of) Jimmy Changas's sales-tax payments, the Agreement did not require Jimmy Changas to hire only League City residents, and the establishment of the entertainment district as a "regional destination" would benefit visitors as well as the City's residents. Although we do not doubt that Texas citizens other than League City residents could receive some benefit from a new Jimmy Changas restaurant within the City's

---

[7] *See also City of Houston v. Quinones*, 177 S.W.2d 259, 261 (Tex. 1944) (distinguishing an act that is "public in its nature and performed as the agent of the State in furtherance of general law for the interest of the public at large" from those "performed primarily for the benefit of those within the corporate limits of the municipality").

entertainment district, the Agreement itself confirms that the City entered into it "*primarily* for the benefit of those within the corporate limits of the municipality." *Wasson II*, 559 S.W.3d at 151 (emphasis added) (quoting *Gates v. City of Dallas*, 704 S.W.2d 737, 739 (Tex. 1986)). This factor weighs in favor of a proprietary function.

### 3. Acting on the City's own behalf

Under the third factor, we consider whether the City was acting on the State's behalf or on its own behalf by entering into the Agreement. *Wasson II*, 559 S.W.3d at 150. This factor further distinguishes between acts a city chooses to perform "in its private capacity" to benefit its residents from those "sovereign" acts it is required to perform as an "arm or agent of the state in the exercise of a strictly governmental function solely for the public benefit." *Shilling*, 240 S.W.2d at 1011–12; *Dilley*, 222 S.W.2d at 993. The statute similarly defines governmental functions as those "given it by the state as part of the state's sovereignty." TEX. CIV. PRAC. & REM. CODE § 101.0215(a).

We have recognized that when the first and second factors both indicate that a city entered into a contract as a proprietary function—that is, it entered into the contract as a matter of its own discretion and did so primarily to benefit its own residents—then the city was likely acting on its own behalf, at least absent some clear indication to the contrary. *See Wasson II*, 559 S.W.3d at 152. Nevertheless, even when a city exercises its own discretion to enter a contract, it may be acting on the State's behalf when, for example, the State provides funding or other support for the city's efforts. *See, e.g., Hays Street Bridge*, 570 S.W.3d at

17

706 (holding that the third factor weighed towards governmental function because the State provided most of the necessary funding).

League City contends that it entered into the Agreement on the State's behalf because its purpose was to "create new jobs in the state and increase tax revenue for the state, both of which develop the economy of the state." Again, while we do not doubt that *local* economic-development activities can improve *the State's* overall economy, the terms and requirements of this Agreement do not indicate in any way that the City entered into it on the State's behalf. This factor weighs towards a proprietary function.

### 4. Relation to a governmental function

The final factor considers "whether the city's act of entering into the [contract] was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary." *Wasson II*, 559 S.W.3d at 150. "We have long held that not all activities 'associated' with a governmental function are 'governmental,'" and "[t]he fact that a city's proprietary action 'touches upon' a governmental function is insufficient to render the proprietary action governmental." *Id.* at 152–53. "Instead, a city's proprietary action may be treated as governmental only if it is essential to the city's governmental actions." *Id.* at 153.

League City contends that it engaged in a governmental function when it entered into the Agreement because that action was "sufficiently related" to the governmental function of "sustain[ing] and promot[ing] the economy, employment, and economic opportunities of the people of Texas." *See* TEX. GOV'T CODE § 315.003. The City notes that in chapter

18

501 of the Local Government Code—the Development Corporation Act—the legislature has recognized a "public purpose of this state in promoting the welfare of residents of this state economically by securing and retaining business enterprises and as a result maintaining a higher level of employment, economic activity, and stability," and has specifically authorized municipalities to create nonprofit corporations to promote that purpose. *See* TEX. LOC. GOV'T CODE §§ 501.004(a)(4), .051. Relying on *City of Leon Valley Economic Development Corp. v. Little*, 522 S.W.3d 6, 10 (Tex. App.—San Antonio 2017, pet. denied), the City contends that such actions constitute governmental functions.

We rejected that very conclusion, however, in *Rosenberg Development Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738 (Tex. 2019). As we explained there, the Development Corporation Act describes economic-development corporations "as private, nonprofit corporations" and expressly denies them "significant governmental characteristics—political-subdivision status and attributes of sovereignty" and "thus evinces clear legislative intent that an economic development corporation is not an arm of state government." *Id.* at 749–50. Local economic development and job creation are undoubtedly "public purposes," and projects to promote such purposes "have a governmental flair, but not so uniquely or so definitively that only a governmental entity would engage in those activities." *Id.* at 750. In short, entities engaged in economic-development programs do not provide services that are "essential" to the functions of the government. *Id.* at 750–51.

19

The City also argues that chapter 381 of the Local Government Code authorizes counties to develop programs "for state or local economic development" and "to stimulate, encourage, and develop business location and commercial activity in the county." TEX. LOC. GOV'T CODE § 381.004(b)(1),(3). And, the City points out, these are governmental functions when performed by a county because "all of their functions are 'governmental' in nature." *Nueces County v. San Patricio County*, 246 S.W.3d 651, 652 (Tex. 2008). If a county's local economic-development activities are governmental functions, the City argues, then a city's local economic-development activities must be too.

This argument, however, confuses the nature of an *entity* with the nature of its *functions*. As we explained in *Nueces County*, all of a county's functions are governmental because counties are "'involuntary agents of the state' without the power to serve the local interests of their residents" and as such "have no 'proprietary' functions." *Id.* (citing TEX. CONST. art. XI, § 1 interp. commentary; *Posnainsky*, 62 Tex. at 128). Unlike counties, municipal corporations are established to serve their local residents by engaging in both proprietary and governmental functions. Because of the nature of a municipality, the nature of its functions matters.

We do not hold, however, that governmental economic-development activities can never constitute a governmental function. Ultimately, all economic-development activities are "local," and circumstances could conceivably exist in which the State requires a municipality to engage in such activities as an arm of the State for the greater benefit of the general public. But that is not what happened

20

here. Here, the State merely authorized cities to enter into contracts to promote their local economy, and League City made the discretionary decision to enter into such a contract with Jimmy Changas. But the contract itself confirms that it did so by choice and primarily to benefit the City and its residents. That discretionary decision was not essential to any governmental function. This factor, as the others, weighs in favor of holding that the City engaged in a proprietary function.

## IV.
## Conclusion

The court of appeals correctly determined that League City engaged in a proprietary function when it entered into the Agreement with Jimmy Changas. As a result, governmental immunity does not apply to protect the City against Jimmy Changas's claim for breach of that Agreement. We do not address the merits of that claim or any other defenses the City may raise. We affirm the court of appeals' judgment and remand the case to the trial court for further proceedings.

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** June 9, 2023

21