# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00344-CV

---

**Stephani Del Rio and Andrew Del Rio, as Next Friends of "Noelle" and "Luke," Minors, Appellants**

**v.**

**The City of Austin, Appellee**

---

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-22-006236,
### THE HONORABLE DANIELLA DESETA LYTTLE, JUDGE PRESIDING

---

## O P I N I O N

Stephani and Andrew Del Rio (the Del Rios), as next friends of their minor children Noelle and Luke,[1] appeal from the trial court's order granting the City of Austin's (the City) plea to the jurisdiction, in which the City asserted that the Del Rios' claims were barred by governmental immunity. The Del Rios sued the City for injuries their children sustained after they were attacked by a neighbor's dog, Stanley, which had been adopted from the City's Austin Animal Center (AAC) eighteen months earlier. In a single issue on appeal, the Del Rios contend that AAC's administration of adoption services and No Kill policy (NKP) are proprietary functions for which the City was not entitled to immunity. Alternatively, the Del Rios contend

---

[1] To protect the children's privacy, we refer to them using the pseudonyms adopted by the trial court. *See* Tex. R. App. P. 9.9(a)(3), (b).

that the City waived immunity under the Texas Tort Claims Act (TTCA). *See* Tex. Civ. Prac. & Rem. Code § 101.021(2). We affirm the trial court's order.

## BACKGROUND[2]

On Christmas Day 2021, Noelle, then six years old, and Luke, five, were delivering cookies to their next-door neighbor, when Stanley, who the neighbor had adopted from AAC in August 2020, "escaped and barreled toward and into Noelle," leaving her with a concussion, broken arm, and puncture wounds and lacerations to her head. Luke, who had been next to Noelle, ran and hid behind a car. He suffered "severe emotional trauma" from "watching his sister get mauled." The neighbor intervened, and Noelle was able to escape and run home.

Stanley had been repeatedly aggressive while housed at AAC and was twice involved in biting incidents in early 2020. On March 8, 2020, a volunteer mistakenly released him into a play area with a prospective adoptive family, and Stanley lunged at the face of a seven-year-old girl, puncturing her lip, scratching her face, and giving her black eyes.[3] When the girl's mother stepped between her daughter and Stanley, he bit the mother on her arm. On April 10, without provocation, he bit the arm of a college student who had begun fostering him two days before the attack.

The Del Rios sued the City, raising five common law negligence claims—simple negligence, negligent entrustment, strict-liability negligence, per se negligence, and bystander injury—and arguing that the City was not entitled to governmental immunity because its

---

[2] These facts are taken from the Del Rios' amended petition and response to the City's plea to the jurisdiction and the evidence attached to the response.

[3] The girl's mother testified during a deposition that shelter staff "sa[id] that the dog was mismarked and should have never been let out with the public . . . [b]ecause of his aggression."

2

"operation of its [NKP] is not animal control, is ultrahazardous, and is proprietary." The Del Rios argued in the alternative that the City had waived immunity under the TTCA by negligently providing an inherently dangerous piece of property, namely, Stanley, to their neighbor without "various essential safety components that would have protected Noelle and Luke." Those "components" included registration and identification of Stanley as a dangerous dog; a secure enclosure; and a behavioral assessment; or alternatively, euthanasia.

In its plea to the jurisdiction, the City asserted that its administration of animal control services, including the operation of AAC, is a governmental function; that the Del Rios had not pleaded facts showing a waiver of immunity under the TTCA; and that "it is impossible to amend their Petition to invoke this Court's jurisdiction because [they] cannot overcome the City's governmental immunity for performing a governmental function: to wit, animal control." The Del Rios responded by reiterating that "Austin's [NKP] and the resulting decision to release the dog—and other dangerous dogs—is proprietary and discretionary, because it was made to benefit Austin and not the State, it is not historical 'animal control,' and it is ultrahazardous."

The Del Rios attached to their response to the City's plea various exhibits concerning the City's operation of AAC and administration of its adoption program, including a September 2023 report from the City Auditor (OCA), an external evaluation commissioned by the City from the National Center for Animal Shelter Evaluations (NCASE), a January 2024 City Council Work Session slideshow of proposed changes to the Austin Animal Services Office (ASO), and summaries of audit interviews with Chief Animal Services Officer Don Bland and ASO Deputy Officer Jason Garza.

According to the NCASE evaluation, AAC "is the municipal shelter for the City of Austin and unincorporated Travis County, providing shelter to thousands of animals annually

3

as well as providing animal protection and pet resource services." AAC accepts animals regardless of age, health, species, or breed, and "[t]he goal is to place all adoptable animals in forever homes through adoption, foster care, or rescue partner groups." The shelter's mission statement notes that in addition to its housing and placement services, AAC "enforce[s] animal regulations"; "assist[s] the public with animal-related concerns, including impoundment, quarantine, and other rabies control services in order to protect citizens and animals in [the] community"; and "provide[s] animal services." In March 2019, Austin City Council passed a resolution requiring AAC to maintain a 95% live-release rate as part of the City's NKP.

In June 2022, the City Council directed OCA to audit AAC and investigate "the causes of kennel space shortages, among other concerns." Auditors concluded that AAC's "animal welfare priorities conflict with each other" and that AAC "is not able to serve as an open-intake shelter for the community while providing humane care for the animals in its possession and maintaining its goal live release rate." Some staff and community members expressed concern that AAC "was allowing dangerous animals that should be euthanized to be adopted to maintain its high live release rate." Auditors determined that AAC had "consistently adopted and transferred dogs with 'moderate' and 'severe' bite histories" but cautioned that auditors "did not review the circumstances of each bite and cannot say whether these dogs may pose an elevated risk to their community compared to dogs without bite histories."

The audit stressed that NCASE had reviewed AAC's euthanasia policies and found them "in line with best practices for the animal sheltering industry" and "perhaps the best policy we have encountered in all of our evaluations." However, the NCASE evaluation echoed the audit's conclusions and found that AAC struggled to meet its target live-release rate without "compromising humane care of animals," that some dogs with longer lengths of stay at AAC had

4

developed behavioral issues and "may bite or attack other dogs or people," and that AAC needed the City "to discuss and address its tolerance for euthanasia of animals with behaviors that make them high risk for aggressive or violent behavior against people and animals (in the interest of public safety)." The evaluation concluded that "the City appears to be more interested in the self-aggrandizing, and accolades, of being a national and international leader of No-Kill sheltering, rather than being a leader in the humane care and treatment of animals in its care."

In their slideshow presentation to the City Council Work Session, City employees acknowledged that "AAC has experienced several instances where a dog with a known significant bite history has caused severe injury to members of the public after the dog was released from the AAC, and employees/volunteers at the AAC." While "[m]any of these dogs" had become increasingly aggressive over extended stays at the shelter, "[c]urrent ordinances require [the] City to make these dogs available for the public," leading to "a safety risk for adopters." The presenters recommended that in the interest of public safety, dogs with more severe bite histories be made eligible for euthanasia "without making them available to the public / rescue organization[s]."

Bland and Garza expressed frustration to auditors about the NKP and what they perceived to be changes to the scope and nature of the City's animal services. According to auditors, Bland "made clear that municipal shelters are not built to be sanctuaries" and thought that ASO "should be euthanizing more animals." He stated:

> Austin has been on the cutting edge of Animal Services. Animals with behavior issues have been increasing in number. There are more bad behavior animals than our partners are willing to accept, and thus we're stuck with them. Behavior modification is a long process that can take years. We can't euthanize them unless they've done certain things, and therefore we have to keep them. ASO is

5

currently getting sued for adopting an animal that mauled a child, but this was a year after being adopted from ASO.

For years, Animal Protection involved collecting animals to prevent rabies and then adopting some and euthanizing others. Now we vaccinate for rabies, so that's not much of an issue. Bland says we now have a mindset that every loose animal comes into the shelter and no animal gets euthanized. Bland says too many people are collecting animals and bringing them in when their job is to call animal protection.

Garza similarly "described a challenge with working to adopt dogs with behavioral issues." He questioned whether the community had been adequately consulted about the NKP and told auditors that

people are used to a shelter model where they find a dog or animal, bring it to the shelter, and then the shelter euthanizes it, which was how shelter populations were previously managed. Now they have to restrict intake to manage the shelter population, which isn't what people asked for.

In addition to the exhibits, the Del Rios emphasized the inclusion on AAC's website of the answer to a Frequently Asked Question, "Is 'Animal Protection' different than 'Animal Control'?":

The traditional model of animal control was designed to regulate loose dogs and patrol for "rabid and vicious" dogs – hence the term "dogcatcher[].["] This model also was typically enforcement-based.

We have moved toward a more progressive model in which our officers serve to protect, not control, both human and animal life, through a variety of services aimed at educating and supporting the public, and working to keep pets and families together. Instead of immediately issuing citations, our Animal Protection Officers will work with owners to get into compliance and provide resources like fencing and doghouses.

This answer, the Del Rios asserted, constituted an admission by the City that it had abandoned "animal control" in favor of "animal welfare," as embodied by the NKP. In their

6

response, the Del Rios stated that the City had compromised its animal-control function for the sake of the financial and reputational benefits conferred by the NKP and, referring to the policy, stated that "[b]y releasing dangerous dogs into the public (rather than euthanizing them), the City is not engaged in a function essential to Animal Control."

The trial court granted the City's plea to the jurisdiction, and this appeal followed.

## DISCUSSION

### I. Standard of Review

A challenge to a trial court's subject-matter jurisdiction is a question of law properly asserted in a plea to the jurisdiction. *Sampson v. University of Tex.*, 500 S.W.3d 380, 384 (Tex. 2016) (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004)). When, as here, a plea to the jurisdiction challenges only the sufficiency of the pleadings, we review the trial court's ruling on the plea to the jurisdiction de novo, *see id.*, and must "determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause," *Miranda*, 133 S.W.3d at 226 (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). In determining whether a plaintiff has affirmatively demonstrated the trial court's jurisdiction, we "'consider the facts alleged by the plaintiff, and to the extent it is relevant to the jurisdictional issue, the evidence submitted by the parties.'" *Texas Dep't of Crim. Just. v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001) (quoting *Texas Nat. Res. & Conservation Comm'n v. White*, 46 S.W.3d. 864, 868 (Tex. 2001)); *see Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

In reviewing a ruling on a plea to the jurisdiction, we construe the pleadings liberally in the plaintiff's favor, do not weigh the merits of claims, indulge every reasonable

inference, and resolve any doubts in favor of jurisdiction. *See Miranda*, 133 S.W.3d at 228; *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). To succeed, "[t]he party asserting the plea must establish an incurable jurisdictional defect apparent from the face of the pleadings that makes it impossible for the plaintiff's petition to confer jurisdiction on the trial court." *Miranda*, 133 S.W.3d at 228. If a plaintiff fails to plead facts sufficient to establish jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded an opportunity to amend. *Id.* at 226–27; *Texas Tech Univ. Sys. v. Martinez*, 691 S.W.3d 415, 419 (Tex. 2024). If the pleadings affirmatively negate the existence of jurisdiction, a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Miranda*, 133 S.W.3d at 227.

## II. Governmental or Proprietary Function

A municipality's governmental immunity[4] from suit defeats a trial court's subject matter jurisdiction and is properly raised in a plea to the jurisdiction. *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020). To determine if a municipality has immunity from suit, we engage in a two-step inquiry: first, we "determine[ ] the applicability of immunity in the first instance," and "if immunity exists, then we look to statutory law to determine whether the Legislature has waived it." *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 703 (Tex. 2019) (citing *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 432, 435 (Tex. 2016) [*Wasson I*]). Whether a municipality is immune from suit for tortious conduct in turn depends on whether it is acting pursuant to a governmental or proprietary

---

[4] Although the terms are often used interchangeably, "sovereign immunity" protects the state and its divisions, while "governmental immunity" protects political subdivisions such as municipalities. *See Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 703 (Tex. 2019).

function; "[a] municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006).

The governmental/proprietary distinction arose from the common law, but the Legislature "has defined governmental and proprietary functions in the TTCA 'for the purposes of determining whether immunity applies to tort claims against a municipality.'" *City of Austin v. Findley*, No. 03-21-00015-CV, 2022 WL 1177605, at *3 (Tex. App.—Austin Apr. 21, 2022, no pet.) (mem. op.) (quoting *Wasson Ints., Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 147 (Tex. 2018) [*Wasson II*]); *see* Tex. Const. art. XI, § 13 (authorizing Legislature to define governmental and proprietary functions "for all purposes"). The TTCA defines governmental functions as those "that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." Tex. Civ. Prac. & Rem. Code § 101.0215(a). "In addition to this general definition, the Act includes a non-exclusive list designating thirty-six specific activities as governmental functions," including "animal control." *City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 500 (Tex. 2023); *see* Tex. Civ. Prac. & Rem. Code § 101.0215(a)(33); *Texas Bay Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 388–89 (Tex. App.—Fort Worth 2008, no pet.) (recognizing that "[i]f a function is included in this nonexclusive list of governmental functions, the Legislature has deemed it governmental in nature, and we have no discretion or authority to hold otherwise"). Proprietary functions, on the other hand, are defined as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality," including but not limited to "any activity that is abnormally dangerous or ultrahazardous." Tex. Civ. Prac. & Rem. Code § 101.0215(b). A municipality's

9

proprietary functions "do not include those governmental activities listed under Subsection (a)." *Id.* §101.0215(c); *see Wasson II*, 559 S.W.3d at 147.

The Del Rios argue that the trial court erred by granting the City's plea to the jurisdiction because the NKP is a "proprietary policy" that does not constitute "animal control" under subsection 101.0215(a). Referencing the exhibits attached to their response, they assert that the City "has mandated that it will release – rather than control – 95% of the animals it receives as strays or surrenders" without ensuring the animals' safety; that the City is impermissibly motivated by financial and reputational benefits; that it is providing "animal protection" or "animal services" but not "animal control"; that the NKP "is not, and conflicts with, historical 'animal control'"; and that it is ultrahazardous. Citing the Rabies Control Act of 1981, the Del Rios advocate a narrow definition of animal control limited only to "impounding or euthanizing the animal."[5] They state that "[n]othing in Texas'[s] statutes suggests that the Legislature intended that 'animal control' includes deciding to release, rather than humanely disposing of, almost all of a municipality's stray dogs and cats." Because the NKP is not animal control, they contend, we should determine that it is a proprietary function under an analysis of the four factors listed in *Wasson II*. *See* 559 S.W.3d at 150.

The City responds that section 101.0215 is dispositive and that because "animal control" is included within the list of governmental functions in subsection (a), we need not apply the general statutory definitions or *Wasson II* factors. The City argues that by isolating the NKP from the City's broader provision of animal control services, the Del Rios are in effect attempting to impermissibly create "a separate proprietary island within what is statutorily

---

[5] The Rabies Control Act of 1981 is codified in chapter 826 of the Texas Health and Safety Code. *See generally* Tex. Health & Safety Code ch. 826.

10

declared to be a governmental function." *Doe v. City of Fort Worth*, 646 S.W.3d 889, 899 (Tex. App.—Fort Worth 2022, no pet.). Rather than be guided by the Rabies Control Act of 1981, which the City asserts is inapposite and does not define "animal control," the City states that we should instead follow the reasoning from our previous decision in *City of Elgin v. Reagan*, No. 03-06-00504-CV, 2009 WL 483344, at *3 (Tex. App.—Austin Feb. 26, 2009, no pet.) (mem. op.).

In determining whether a function is governmental or proprietary, we look to the factual allegations underlying the claims. *See University of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 513 (Tex. 2019) (courts look to "true nature of the dispute"); *Texas Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 389 (Tex. 2011) (courts look to "'real substance' of the plaintiff's claims" in determining jurisdiction). "Governmental functions 'encompass activities that are closely related to or necessary for performance of the governmental activities designated by statute,'" *Findley*, 2022 WL 1177605, at *3 (quoting *Rogers v. City of Houston*, 627 S.W.3d 777, 795 (Tex. App.—Houston [14th Dist.] 2021, no pet.)), and "[t]he introduction of a proprietary element into an activity designated by the Legislature as governmental does not serve to alter its classification," *City of Texarkana v. City of New Bos.*, 141 S.W.3d 778, 785 (Tex. App.—Texarkana 2004, pet. denied), *abrogated on other grounds by Tooke v. City of Mexia*, 197 S.W.3d 325, 338–42, n.60 (Tex. 2006); *see City of San Antonio v. Butler*, 131 S.W.3d 170, 178 (Tex. App.—San Antonio 2004, pet. denied) (recognizing that "all actions related to a designated government function are reclassified as governmental by the statute"). Further, a municipality has discretion as to how it exercises a governmental function, and neither that discretion nor the municipality's motive for engaging in an activity can convert a governmental function into a proprietary function. *See Hunnicutt*

11

*v. City of Webster*, 641 S.W.3d 584, 591–92 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *Butler*, 131 S.W.3d at 177.

What the Del Rios characterize as Stanley's "release[] into [their] neighborhood" is in fact AAC's provision of adoption services. The evidence submitted with the Del Rios' response shows that in addition to facilitating the adoption of stray or surrendered animals, AAC serves as an open-intake housing facility for the City and Travis County; provides veterinary care to sick or wounded animals; oversees euthanasia of animals for medical or behavioral reasons; offers educational services to the public; enforces animal regulations; and assists the public with "animal-related concerns, including impoundment, quarantine, and other rabies control services." AAC leadership also collaborates with the Animal Advisory Commission regarding compliance with the Texas Health and Safety Code as well as animal-welfare policies and programs. Pursuant to its NKP, the City mandates that no more than five percent of animals housed at AAC may be euthanized, as compared with live-release rates of 81.6%, 76.4%, and 85.8% in San Antonio, Dallas, and Houston, respectively.[6]

The facts of the present case are similar to those in *City of Elgin v. Reagan*, 2009 WL 483344, at *1–2. Kari Reagan adopted a dog from the City of Elgin Animal Shelter after being told by a city employee that the dog was good with children. *Id.* at *1. Approximately five hours after she brought the dog home, however, it attacked her four-year-old son, causing injuries that required stitches. *Id.* Reagan's husband sued the City of Elgin for negligence in failing to euthanize the dog and in allowing Reagan to adopt it. *Id.* at *2. The City of Elgin responded by filing a joint motion for summary judgment and plea to the jurisdiction, in which it asserted governmental immunity and argued that "allowing members of the public to

---

[6] The City's target was raised from 90% in 2019.

adopt animals from its shelter is a governmental function because the activity is a component of animal control, which is one of the activities expressly designated as a governmental function by the legislature." *Id.* at *2–3. Noting that "[c]ourts have repeatedly recognized that activities that are closely related to or necessary for the performance of governmental functions are also governmental functions" and that an ordinance in effect at the time of the adoption authorized the City of Elgin to sell or humanely dispose of unclaimed animals, we held that "allowing the adoption of animals from the City's shelter is an activity so closely related to animal control that it is a governmental function." *Id.* at *3 (citing *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 357 (Tex. App.—Houston [14th Dist.] 2008, no pet.)); *see Butler*, 131 S.W.3d at 177–78.

The Del Rios argue that *Wasson II* "mandates a different result" in this case because although "[a]dopting dogs may touch upon 'animal control,'[] it's not essential to it as *Wasson II* requires."[7] The Del Rios also argue that the City of Elgin's ordinance permissibly allowed for either euthanasia (i.e., humane disposal) *or* adoption, whereas the NKP's "prohibition on the humane disposition of stray dogs is contrary to – rather than essential to – the State's animal control statute."

We first note that "animal control" is undefined by the TTCA. Neither the Rabies Control Act of 1981 nor the other statutes identified by the Del Rios as illustrative of the term's scope—subsections 822.001(1) and 822.041(1) of the Health and Safety Code and subsection

---

[7] *Wasson II*, which is discussed below, in fact states that although "'governmental functions encompass activities that are *closely related to or necessary* for performance of the governmental activities designated by statute,'" *Wasson Ints., Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 153 (Tex. 2018) (quoting *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 356 (Tex. App.—Houston [14th Dist.] 2008, no pet.)), a municipality's "*proprietary action* may be treated as governmental only if it is essential to the city's governmental actions," *id.* (emphasis added).

13

92.001(1) of the Civil Practice and Remedies Code—purport to offer a comprehensive definition, and, even if they did, the Del Rios have cited no legal authority applying those statutes when construing the meaning of "animal control" in section 101.0215. *See* Tex. Health & Safety Code §§ 822.001(1) (defining "animal control authority" in relevant part as "a municipal or county animal control office with authority over the area in which the dog is kept"), .041(1) (same), 826.033(a) (authorizing municipalities to adopt ordinances allowing for impoundment of stray dogs and cats and humane disposition of unclaimed animals on expiration of impoundment period); Tex. Civ. Prac. & Rem. Code § 92.001(1) (defining "animal control agency" as "a municipal or county animal control office, or a state, county, or municipal law enforcement agency, that collects, impounds, or keeps stray, homeless, abandoned, or unwanted animals").[8]

Next, the Del Rios are incorrect in their assertions that the NKP prohibits euthanasia or mandates the unconditional release or sale of animals in municipal custody. Rather, as recited in AAC's mission statement, the shelter's goal is "to provide live outcomes for at least 95% of sheltered animals," a number which recognizes the unavoidable necessity of euthanasia for medical or behavioral reasons. The City's policy is similar to the one at issue in *Reagan*. We judicially notice that the relevant municipal ordinance in effect at the time of Stanley's adoption provided that surrendered or stray animals became the City's property immediately upon or three days after impoundment, respectively; that the City was authorized to transfer, place, or sell impounded animals; and that impounded animals could be euthanized if they were "irremediably suffering," "dangerous," or after seven days if certain notice

---

[8] The statutes would, if anything, support the determination that the City's impoundment policies and NKP constitute animal control.

14

requirements were met. *See* Austin, Tex., Code of Ordinances, ch. 3-1, art. 3, § 3-1-25 (2021); *see also* Tex. R. Evid. 204 (allowing judicial notice of municipal law).

The Del Rios argue that this case is similar to *City of Austin v. Liberty Mutual Insurance*, in which this Court concluded that the appellees' tort claims arose from the City's performance of a proprietary function, namely, the operation and maintenance of a public utility, and that the claims were therefore not barred by governmental immunity. *See* 431 S.W.3d 817, 830 (Tex. App.—Austin 2014, no pet.); Tex. Civ. Prac. & Rem. Code § 101.0215(b) (listing "the operation and maintenance of a public utility" as example of proprietary function). The claims involved a fire that the appellees alleged was caused when overhead distribution lines belonging to the City's electric utility contacted each other during high wind, dropping molten metal onto dry vegetation. *See id.* at 821. The appellees also alleged that the City had created the conditions for the fire by failing to inspect, maintain, or repair its equipment; in other words, by "negligently perform[ing] its obligation to safely operate and maintain its electric-distribution system." *See id.* at 821, 829.

The Court rejected the City's contentions that it was engaging in the statutorily enumerated governmental functions of "fire protection and control" and "engineering functions" and that its actions pursuant to these functions were entitled to immunity under subsection 101.0215(c) even though they "were performed in the context of its operation of a public utility." *See id.* at 822, 828; Tex. Civ. Prac. & Rem. Code § 101.0215(a)(1), (30). In refusing to construe the City's inaction as fire protection, the Court explained:

> Activities (or, in this case, non-activities) that serve only to *create* a fire risk cannot reasonably be considered to constitute "fire protection and control" activities. [The a]ppellees allege that the City's operation of the public utility created a greater risk of fire and thus were activities that actually frustrated, rather

15

than served to perform, the governmental function of "fire protection and control." The City counters that the activities complained of are "closely related to" or "associated with" fire protection and control such that it should be considered to have been performing a governmental function. *See, e.g.*, *Petroleum Traders*, 261 S.W.3d at 356–57. We agree with [the] appellees.

*Liberty Mut.*, 431 S.W.3d at 829.

The Del Rios argue that the City is similarly negligent by failing to perform animal control because it proscribes euthanasia and mandates the release of all animals in its care. This description mischaracterizes the NKP, as discussed above, and is not the same as the situation in *Liberty Mutual*. In that case, the City by its own admission was performing actions "in the context of" a proprietary function; it contended only that the actions it was accused of failing to take as part of that function should be considered governmental and that it should consequently be entitled to immunity. *Id.* at 828. Significantly, the Court disagreed with the City's characterization. *Id.* at 829. The Court did not conclude, as the Del Rios assert, that the City's actions were proprietary because despite being undertaken to advance a governmental function, they in fact accomplished the opposite. Instead, the Court concluded that "[t]he alleged failures by the City to safely operate its public utility do not resemble activities undertaken in pursuit of the governmental function of controlling and protecting against fires" and that the City's activities "fall squarely within an enumerated proprietary function." *Id.*

For these reasons and because we are bound to follow our holding in *Reagan* that allowing the adoption of animals from a city's shelter is "an activity so closely related to animal control that it is a governmental function," 2009 WL 483344, at *3, we hold that euthanizing animals impounded in a municipal shelter after they have become the city's property constitutes "animal control" for purposes of subsection 101.0215(a)(33), *see* Tex. Civ. Prac. & Rem. Code

16

§ 101.0215(a)(33); *Butler*, 131 S.W.3d at 177. Concerns regarding the City's discretion in exercising the function or its motivation for doing so are immaterial and do not deprive the City of governmental immunity. *See Doe*, 646 S.W.3d at 899; *Hunnicutt*, 641 S.W.3d at 592; *Butler*, 131 S.W.3d at 177. While the Del Rios may disagree with specific actions taken by the City in its administration of AAC or in deciding which or how many animals to euthanize, they may not divide the governmental function of animal control into constituent aspects and thereby create a "proprietary island within what is statutorily declared to be a governmental function." *See Doe*, 646 S.W.3d at 899; *City of Plano v. Homoky*, 294 S.W.3d 809, 815 (Tex. App.—Dallas 2009, no pet.).

Having determined that the City's NKP and adoption policies fall within the statutorily enumerated governmental function of "animal control," it is unnecessary and improper to analyze their character under the general definitions provided in section 101.0215 or *Wasson II*. Neither the definitions nor *Wasson II* offers an analytical framework for determining whether a municipality's action falls within an enumerated governmental function. To the contrary, courts look to the definitions of proprietary and governmental functions under both the common law and section 101.0215 only if a particular activity *is not* included in subsection 101.0215(a)'s list of governmental functions. *See City of League City*, 670 S.W.3d at 500 ("If a particular activity is not included in the statutory list of governmental functions, we look to the general definitions under both the common law and the statute."); *Hunnicutt*, 641 S.W.3d at 592 ("[W]hen the activity at issue is specifically enumerated as a governmental function by the legislature in the [TTCA], the parties need not additionally determine whether the activity or action *also* meets the general definitions."). Accordingly, we do not consider the Del Rios'

17

argument that the NKP is ultrahazardous under subsection 101.0215(b). *See* Tex. Civ. Prac. & Rem. Code § 101.0215(a)(33), (b)(3), (c).[9]

Regarding *Wasson II*, we note that it, like *Wasson I*, was a breach-of-contract case, and the Texas Supreme Court's holding was tailored to the nature of the dispute. *See Hays St. Bridge Restoration Grp.*, 570 S.W.3d at 704 ("Our recent opinions in [*Wasson I*] and [*Wasson II*] govern the analysis of whether municipal action challenged in a breach-of-contract case is proprietary or governmental."). As our sister court stated in rejecting the relevance of *Wasson II* to tort cases:

> *Wasson* was a breach of contract case. This is not. The governmental–proprietary determination requires consideration of the "context within which the [allegedly tortious] conduct occurred," *see Texas Bay Cherry Hill*, 257 S.W.3d at 388–89, and in a breach case like *Wasson*, that context is the parties' contract, *see Wasson II*, 559 S.W.3d at 149. Here, Doe is not suing the City for a breach of her volunteer employment contract, if any such contract exists. Doe is suing based on the City's allegedly negligent conduct in its maintenance and supervision of the animal shelter while it was performing its animal control function.

*Doe*, 646 S.W.3d at 899.

*Wasson II* held only that an analysis of whether governmental immunity bars a breach-of-contract claim is governed by "the nature of the function the municipality was performing when it entered into the contract." *Wasson II*, 559 S.W.3d at 154. Although the Court developed four factors to assist its determination of whether a municipality's leasing property to private individuals is a governmental function, the Court explained that the factors

---

[9] We also rejected that argument in *Reagan* and, as discussed above, do not agree with the Del Rios' attempt to distinguish the City of Elgin's ordinance as qualitatively different from the City's in effect. *See City of Elgin v. Reagan*, No. 03-06-00504-CV, 2009 WL 483344, at *3 n.2 (Tex. App.—Austin Feb. 26, 2009, no pet.) (mem. op.) (declining to characterize City of Elgin's activity as "allowing the adoption of 'vicious' dogs" and noting that Reagan "does not cite to, and we have not found, any legal authority in support of his contention that allowing the adoption of animals is an ultrahazardous activity").

resulted from its applying the common-law and statutory definitions to "the parties' arguments in this case" and that it did so only because the municipal activity in question was not enumerated in subsection 101.0215(a). *See id.* at 150; Tex. Civ. Prac. & Rem. Code § 101.0215(a). Conversely, because "animal control" is an enumerated governmental function, the *Wasson II* factors would be inapposite even if applicable in tort cases. *Cf. Town of Highland Park v. McCullers*, 646 S.W.3d 578, 593 n.21 (Tex. App.—Dallas 2021, no pet.) (finding that consideration of *Wasson II* factors was foreclosed by conclusion that Town was engaged in police protection, which is enumerated governmental function).

Reviewing the evidence in the record, we conclude that the City was engaged in a governmental function and is entitled to governmental immunity unless expressly waived by statute. *See* Tex. Civ. Prac. & Rem. Code § 101.0215(a)(33); *Hays St. Bridge Restoration Grp.*, 570 S.W.3d at 703. We overrule the Del Rios' issue on appeal.

## III. Waiver

The TTCA expressly provides a limited waiver of governmental immunity in three areas when the statutory requirements are met: (1) use of publicly owned automobiles; (2) injuries arising out of a condition or use of tangible personal property; and (3) premises defects. *Sampson*, 500 S.W.3d at 384; *see* Tex. Civ. Prac. & Rem. Code § 101.025 (waiving immunity to suit against governmental unit to extent of liability created by chapter and authorizing person having claim under chapter to sue governmental unit for damages allowed by chapter). Specifically, subsection 101.021(2) of the TTCA provides that a governmental unit "is liable for . . . personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant

19

according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021(2). The TTCA "does not create a cause of action; it merely waives sovereign immunity as a bar to a suit that would otherwise exist." *Sampson*, 500 S.W.3d at 387 (quoting *City of Tyler v. Likes*, 962 S.W.2d 489, 494 (Tex. 1997)).

The Texas Supreme Court has defined "condition" in subsection 101.021(2) as "either an intentional or an inadvertent state of being." *Sampson*, 500 S.W.3d at 388 (quoting *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 49 (Tex. 2015)). "To state a 'condition' claim under the Tort Claims Act, there must be an allegation of 'defective or inadequate property.'" *Id.* (quoting *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex. 1983)). Among its cases interpreting subsection 101.021(2)'s "condition" prong,[10] the Court has recognized "a narrow exception to the rule that a governmental unit's act of furnishing personal property to an individual to use is not a 'use' of that property by the government." *Texas Sch. for Blind & Visually Impaired v. Dugosh*, No. 03-07-00681-CV, 2010 WL 1170223, at *10 (Tex. App.—Austin Mar. 26, 2010, pet. denied) (mem. op.). The exception—which the Court has characterized as "the outer bounds of what [it] ha[s] defined as use of tangible personal property"—is "limited to claims in which a plaintiff alleges that a state actor has provided property that lacks an integral safety component and that the lack of this integral component led to the plaintiff's injuries." *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 585 (Tex. 1996).

---

[10]    Although the cases creating the "integral safety component" exception do not distinguish between "condition or use," the Texas Supreme Court has more recently characterized the exception as part of the "condition" prong or as part of both prongs. *See Texas Sch. for Blind & Visually Impaired v. Dugosh*, No. 03-07-00681-CV, 2010 WL 1170223, at *14 (Tex. App.—Austin Mar. 26, 2010, pet. denied) (mem. op.) (citing *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004); *Texas Dep't of Crim. Just. v. Miller*, 51 S.W.3d 583, 592 (Tex. 2001)).

20

In their issue in the alternative, the Del Rios contend that the City waived immunity under the TTCA because Stanley was "an inherently dangerous piece of property," and Noelle and Luke's injuries were caused by "the City's release of the dog into the public without essential safety components," including registration as a dangerous dog, a "dangerous dog tag," a secure enclosure, or a behavioral assessment.[11] On the other hand, the Del Rios also argue that "because there were no essential safety components that could have reasonably made [the dog] safe for the public, the City was negligent in releasing [the dog] at all – and it was negligent by not euthanizing the dog."[12]

The City replies that "there is neither precedent, nor a logical basis, for classifying adopted shelter dogs as tangible personal property under [sub]section 101.021(2)'s waiver," that "there is neither precedent nor a logical basis for treating adopted shelter animals now owned by a private party in the same way Texas treats inanimate objects provided by the government," and that the City's decision not to euthanize Stanley was an exercise of discretion for which it did not waive immunity under subsection 101.056.

We disagree that a dog housed at a municipal shelter cannot be tangible personal property. Indeed, at least two of our sister courts have found police dogs to be personal property in the specific context of subsection 101.021(2). *See City of Houston v. Jenkins*, 363 S.W.3d 808, 813 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("It is undisputed that a dog is tangible personal property."); *City of Houston v. Davis*, 294 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("[T]he pleadings show the personal injury was caused

---

[11] Insomuch as the Del Rios contend that the City waived immunity by allowing their neighbor to adopt a dog that was "inherently unsafe," the argument is without merit. *See Reagan*, 2009 WL 483344, at *4.

[12] Brackets in original.

by the police officer's use of tangible personal property, the dog that bit Davis."); *cf. Atnipp v. State*, 517 S.W.3d 379, 388 (Tex. App.—Eastland 2017, pet. ref'd) (concluding that although trial court properly refused to include instruction that "a dog [is] tangible personal property," definition was unnecessary because "[t]he jury would have had common knowledge and experience that a dog is an owner's property").

However, although dogs can be property, they are property of a qualitatively different nature than the property for a condition of which courts have found waiver under subsection 101.021(2). *See, e.g.*, *Robinson v. Central Texas MHMR Ctr.*, 780 S.W.2d 169, 171 (Tex. 1989) (concluding that mental health facility that provided swimming attire to epileptic patient but did not provide life preserver waived immunity); *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 300 (Tex. 1976) (finding no immunity for university that provided uniform and equipment to football player but failed to provide knee brace); *Overton Mem'l Hosp. v. McGuire*, 518 S.W.2d 528, 529 (Tex. 1975) (determining that hospital bed lacking side rails, which was provided by city-owned and -operated hospital, was defective). Moreover, the Del Rios have provided no authority for the proposition that secure enclosures, registration, "dangerous dog tags," or behavioral assessments are "integral safety components" of dogs, and the Del Rios' list is wholly dissimilar to the absent property features in the cases above. We have previously rejected the argument that a "dog's lack of an appropriate disposition to be a family dog is equivalent to a lack of an integral safety component such as a life preserver or knee brace," noting that "nothing in *Lowe* or *Robinson* suggests that an intangible concept such as a dog's temperament would fall within the supreme court's limited holdings." *Reagan*, 2009 WL 483344, at *4. The Texas Supreme Court has stated that such cases are the "outer bounds" of subsection 101.021(2), and we will not extend the boundaries still further.

22

We are also unwilling to extend the narrow exception to cases in which an injury was alleged to have been caused by property provided by a state actor to someone *other than* the plaintiff. *See Robinson*, 780 S.W.2d at 171; *Lowe*, 540 S.W.2d at 300; *McGuire*, 518 S.W.2d at 529; *see also Bonham v. Texas Dep't of Crim. Just.*, 101 S.W.3d 153, 159 (Tex. App.—Austin 2003, no pet.) ("In these cases, state property actually provided *to a plaintiff* lacked some integral safety component) (emphasis added). Under the pleaded facts, the City provided Stanley not to the Del Rios but to their neighbor. We have found no authority indicating that the State and its political subdivisions have consented to surrender their immunity when property that they have transferred ownership of to an individual injures a third party.

To the extent that the Del Rios argue that the City's decision not to euthanize Stanley was a "condition" of his or a "use" of him by the City, we are unpersuaded. As in *Reagan*, we will not say that an "intangible concept" such as life is an integral safety component. *Reagan*, 2009 WL 483344, at *4. And even assuming that euthanasia constitutes a "use" of property for purposes of subsection 101.021(2), a "claim of 'mere non-use' is insufficient to waive immunity; actual use is required." *McKenzie*, 578 S.W.3d at 513.[13]

We conclude that the pleaded facts do not show that the City waived immunity under subsection 101.021(2) of the TTCA and that the trial court did not err by granting the City's plea to the jurisdiction. We overrule the Del Rios' alternative issue.

---

[13] Because we do not find a waiver of immunity, we do not reach the City's argument under section 101.056. *See Reagan*, 2009 WL 483344, at *5 ("[W]e reach an analysis under section 101.056 only after a plaintiff has established a waiver of immunity.").

23

## IV. Opportunity to Amend

The question then becomes whether the Del Rios are entitled to an opportunity to amend their pleadings. *See Dohlen v. City of San Antonio*, 643 S.W.3d 387, 397 (Tex. 2022). As noted above, when pleadings do not contain sufficient facts to establish the trial court's jurisdiction, we generally afford the plaintiff the opportunity to amend the pleadings. *Miranda*, 133 S.W.3d at 226–27; *see Dohlen*, 643 S.W.3d at 397 ("Texas courts allow parties to replead unless their pleadings demonstrate incurable defects.").

However, the Del Rios have not and cannot show that the City waived immunity under the facts of this case. *See Reagan*, 2009 WL 483344, at *5. Because their pleadings and jurisdictional evidence affirmatively negate the existence of jurisdiction, we need not allow them the opportunity to amend. *See Miranda*, 133 S.W.3d at 227; *Miller*, 51 S.W.3d at 587.

## CONCLUSION

Because the pleadings and jurisdictional evidence demonstrate that the Del Rios' suit incurably falls outside any waiver of immunity under the TTCA, we affirm the trial court's order granting the City's plea to the jurisdiction without leave to amend.

_____

Rosa Lopez Theofanis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed: January 31, 2025

24